TANOX, INC. f/k/a Tanox Biosystems, Inc., Appellant,

v.

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Robinson Law Firm, Williams, Birnberg & Andersen, L.L.P., Michael J. Madigan, Michael J. Mueller, Kenneth M. Robinson, and Gerald M. Birnberg, Appellees.

No. 14–00–00765–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 24, 2003.

Eugene A Cook, David W. Holman, Kenneth R. Breitbeil, Warren W. Harris, Houston, for appellants.

Julius Glickman, Joy M. Soloway, Houston, for appellees.

Panel consists of Justices HUDSON, FOWLER, and EDELMAN.

## OPINION ON REHEARING

J. HARVEY HUDSON, Justice.

Tanox, Inc. f/k/a Tanox Biosystems, Inc., appeals the trial court's confirmation of an arbitration award in favor of Akin, Gump, Strauss, Hauer & Feld, L.L.P., The Robinson Law Firm, and Williams, Birnberg & Andersen, L.L.P., and the summary judgment entered in favor of Michael J. Madigan, Michael J. Mueller, Kenneth M. Robinson, and Gerald M. Birnberg. On original submission we affirmed in part, and reversed and remanded in part. On rehearing, the panel has withdrawn our previous opinion of August 27, 2002, and substitutes the following opinion on rehearing in which we have affirmed the judgment of the trial court.

## I. BACKGROUND

Tanox envisaged the use of an antibody called "anti-IgE" in the treatment of asthma and allergies. To develop the antibody, Tanox needed a partner. Tanox, accordingly, entered into a confidentiality agreement with Genentech, Inc. in 1989, for the development of the antibody. Genentech subsequently decided not to work with Tanox. Therefore, in 1990, Tanox entered into an agreement with Ciba–Geigy, Ltd., under which Ciba–Geigy agreed to pay Tanox royalties on the sale of the product.

In December 1993, Tanox filed a trade secret lawsuit in federal district court against Genentech alleging that Genentech had violated the confidentiality agreement and utilized Tanox's biotechnology to develop its own allergy drug. In January 1994, Genentech filed a separate lawsuit against Tanox, asserting a claim for patent infringement. Genentech added Ciba–Geigy as a defendant in its patent infringement lawsuit, and the two lawsuits were consolidated.

Tanox had originally hired Ed Harrell of Hughes, Watters & Askanase to represent it in the trade secret lawsuit on an hourly rate basis. Tanox, however, was not able to continue paying Harrell and his law firm on an hourly rate and, accordingly, sought counsel to represent it on a contingency fee basis with respect to its trade secret claim against Genentech. After considering a number of attorneys, Tanox ultimately hired Gerald Birnberg of Williams, Birnberg & Andersen, Kenneth Robinson of The Robinson Law Firm, and Michael Madigan and Michael Mueller of Akin, Gump, Strauss, Hauer & Feld (collectively, "the Lawyers") on a contingency fee basis. On August 1, 1994, Tanox entered into a contingency fee agreement with the Lawyers for representation of its trade secrets claim.[1]

Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pur-

---

1. Tanox and the law firms, Akin, Gump, Strauss, Hauer & Feld, L.L.P., the Robinson Law Firm, and Williams, Birnberg & Andersen, were the parties to the fee agreement. Although the Individual Lawyers, Michael Madigan, Michael Mueller, Kenneth Robinson, and Gerald Birnberg, were not parties to the agreement, for the purposes of simplicity, we will refer to the law firms and the Individual Lawyers as "the Lawyers." The Lawyers and Tanox entered into a separate hourly fee agreement with regard to Genentech's patent infringement claim against Tanox.

suant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33⅓% of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million. In the event the case was settled before, during, or after trial, Tanox agreed the first $8 million received from Genentech would be paid to the Lawyers, "regardless of whether the total recovery amounts to or is less than $32 million."

The fee agreement further provided the Lawyers would, in the event of a settlement, recover fees in the form of a "new business arrangement." Specifically, the Lawyers would be paid on "[a]ny cash, money, or substantial equivalent, any tangible property, and any future payments (such as licensing fees, royalties, income from third parties with respect to defendants' intellectual property, and similar future payments) received by Tanox as a result of the litigation, on account of such new business arrangement, . . ." The Lawyers' share of royalties from a new business arrangement achieved as a result of the litigation was 10%.

Tanox also agreed to pay the Lawyers $100 million if they obtained a permanent injunction barring Genentech from entering the marketplace with a product competitive with an allergy product developed by Tanox. The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million.

On January 30, 1996, Tanox and Genentech agreed to a settlement, which included a $16 million cash payment to Tanox by Genentech and a new business arrangement among Tanox, Genentech, and Ciba–Geigy for the development of the allergy drug. The new business arrangement provided for (1) the release of Genentech's patent infringement claims against Tanox, (2) the release of Tanox's unasserted pat-

ent infringement claims against Genentech, (3) the cross-licensing of patent rights, and (4) Tanox's receipt of royalties from Genentech and Ciba–Geigy. Furthermore, Ciba–Geigy and Genentech agreed to combine their efforts in certain markets, which Ciba–Geigy held exclusively under its 1990 agreement with Tanox.

On July 8, 1996, the parties signed the settlement agreement. Although the fee agreement provides Tanox would "not obtain any settlement nor receive any funds relating to this matter without first consulting with and making full disclosure to the successor attorneys," Genentech transferred $16 million to Tanox directly on July 12, 1996. Tanox did not inform the Lawyers of the $16 million wire transfer. On July 15, one of the Lawyers, Michael Madigan, learned of the $16 million wire transfer from Genentech's counsel.

When confronted about the receipt of the $16 million, David Anderson, Tanox's executive vice president, chief operating officer, and in-house counsel, first claimed he did not know whether Tanox had received the $16 million payment, and then would not confirm whether the money was in the country. The Lawyers demanded immediate payment of $8 million from Tanox. Tanox offered to pay the Lawyers $7 million, less expenses, if they would give up their rights under the fee agreement to royalties received by Tanox.

On July 16, 1996, the Lawyers filed a motion to intervene under seal in federal court seeking to recover its fees. Tanox objected to the motion to intervene and, alternatively, moved to compel arbitration of the fee dispute under the arbitration clause in the fee agreement. The Lawyers and Tanox entered into an agreement under which (1) Tanox agreed to wire $6,724,795.15 on July 29, 1996, to an escrow account in the name of Hughes, Watters & Askanase, which in turn would

transfer the money to Akin, Gump when the motion to dismiss the litigation had been filed with the court; (2) Tanox and the Lawyers agreed to submit their dispute over the fees to arbitration; and (3) the Lawyers agreed to withdraw their motion to intervene on July 26, 1996.

The fee dispute proceeded to arbitration before a panel of three arbitrators. On September 29, 1999, the arbitrators issued their award in favor of the Lawyers. The arbitrators found Tanox breached the fee agreement by failing to pay the Lawyers the first $8 million received from Genentech and Tanox anticipatorily breached the fee agreement by repudiating its obligation to pay a percentage contingent fee on royalty payments received by Tanox pursuant to the new business arrangement.[2] The arbitrators found against Tanox on its claims for breach of contract and its tort claims, including breach of fiduciary duty, legal malpractice, and fraud.

The Lawyers moved to confirm the arbitration award and Tanox filed an application to vacate the arbitration award. On February 16, 2000, the trial court entered an amended interlocutory judgment granting the motion and application to confirm the arbitration award, denying the motion to vacate the award, and ordering that Tanox take nothing on its claims against the Lawyers.

Asserting the arbitration award precluded Tanox's claims against them, the Individual Lawyers moved for summary judgment on the affirmative defenses of res judicata and collateral estoppel on all of Tanox's claims. On March 28, 2000, the trial court granted summary judgment in favor of the Individual Lawyers and entered a final judgment, from which Tanox brings this appeal.

## II. STANDARD OF REVIEW

■ Although the parties agree the Federal Arbitration Act ("FAA")[3] applies to this case, they dispute the judicial standard of review that should be applied to the arbitration award. Ordinarily, the court of appeals reviews the trial court's decision to confirm an arbitration award de novo under the FAA. *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996 (5th Cir.1995). The review of an arbitration award, however, is usually "extraordinarily narrow." *Hughes Training, Inc. v. Cook*, 254 F.3d 588, 593 (5th Cir.2001), *cert. denied*, 534 U.S. 1172, 122 S.Ct. 1196, 152 L.Ed.2d 135 (2002). The court may not review the arbitrators' decision on the merits even if it is alleged that the decision is based on factual error or it misinterprets the parties' agreement. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001); *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). It is presumed under the FAA that arbitration awards will be confirmed. *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir.), *cert. denied*, 531 U.S. 878, 121 S.Ct. 187, 148 L.Ed.2d 130 (2000). Therefore, " '[d]isputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator. Successful court challenges are few and far between.' " *Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir.2001) (quoting *Keebler*

---

**2.** Although the arbitrators found Tanox had purposely concealed from the Lawyers its receipt of $16 million from Genentech on July 12, 1996, and collaborated with Genentech in an effort to avoid its contractual obligation to pay the Lawyers the first $8 million received,

the arbitrators found Tanox did not commit actionable fraud because the Lawyers did not rely on Tanox's misrepresentations to their detriment.

**3.** 9 U.S.C. § 1, *et seq.* (1999 & Supp.2001).

*Co. v. Truck Drivers, Local 170,* 247 F.3d 8, 10 (1st Cir.2001)).

■■■ Although acknowledging the FAA defines the standard of review for vacatur of arbitration awards, Tanox argues the parties contractually agreed to expand the scope of review beyond that provided by the FAA. The parties may agree to expand judicial review of an arbitration award beyond the scope of the FAA. *Hughes Training, Inc.,* 254 F.3d at 593.[4] Tanox and the lawyers agreed to submit their disputes to arbitration "under the rules of the American Arbitration Association then in place and applicable legal and equitable principles." The fee agreement further includes a choice of law provision stating the "agreement shall be construed in accordance with the laws of the State of Texas." Tanox contends these provisions reflect the parties' intent that the arbitrators' award should be judicially reviewed under "the normal appellate standard of review."

Other courts have addressed this issue. The Ninth Circuit Court of Appeals considered an arbitration provision in which the parties agreed " '[t]he decisions and awards of the Tribunal may be enforced by the judgment of the Court or may be vacated, modified or corrected by the Court (a) based upon any grounds referred to in the Act, or (b) where the Tribunal's *findings of fact are not supported by substantial evidence,* or (c) where the Tribunal's *conclusions of law are erroneous.*' " *LaPine Tech. Corp. v. Kyocera Corp.,* 130 F.3d 884, 887 (9th Cir.1997) (emphasis added). Finding the parties had contracted for heightened judicial scrutiny of the arbitrators' award when they agreed to review of errors of fact or law, the court

held it could not disregard the parties' agreement by limiting its review to the grounds for vacatur set forth in the FAA. *Id.* at 888.

The Fifth Circuit Court of Appeals has twice addressed this issue. In *Gateway,* the parties agreed " '[t]he arbitration decision shall be final and binding on both parties, except that *errors of law shall be subject to appeal.*' " *Gateway Techs., Inc.,* 64 F.3d at 996 (emphasis in original). The Fifth Circuit held the parties had contractually agreed to expand judicial review and their contractual provision supplemented the FAA's default standard for review by allowing for de novo review of issues of law embodied in the arbitration award. *Id.* at 997. More recently in *Hughes Training,* the Fifth Circuit found the judicial scope of review was expanded by the arbitration agreement, which provided that " 'in actions seeking to vacate an award, *the standard of review to be applied to the arbitrator's findings of fact and conclusions of law will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury.*' " *Hughes Training, Inc.,* 254 F.3d at 590 (emphasis added).

The arbitration provision of the fee agreement between the Lawyers and Tanox lacks the clear and express language altering the standard of review found in *LaPine, Gateway,* and *Hughes Training.* Therefore, we conclude the parties did not intend to alter the standard of review provided by the FAA. *See UHC Management Co.,* 148 F.3d at 998 (stating parties' intent to expanded judicial review of arbitration award must be clearly and unmistakably expressed).

4. *But see UHC Mgmt. Co. v. Computer Scis. Corp.,* 148 F.3d 992, 997 (8th Cir.1998) (stating "[i]t is not clear, however, that parties have any say in how a federal court will review an arbitration award when Congress has ordained a specific, self-limiting procedure for how such a review is to occur").

Relying on the Texas choice of law provision, Tanox further argues the arbitrators and reviewing court have no authority to disregard Texas law. However, even with the inclusion of a choice of law provision, in the absence of an express provision that is intended to modify the scope of judicial review of an arbitration award, the FAA's default standard is the applicable standard of review in this case. *See Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287, 294 (3d Cir.), *cert. denied,* 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001) (declining to construe choice of law clause, which provided arbitration agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania," as evidencing clear intent to incorporate Pennsylvania's standards for judicial review); *Mantle v. Upper Deck Co.,* 956 F.Supp. 719, 725–26 (N.D.Tex.1997) (observing that even though arbitration agreement provided Texas law would govern substantive disputes in arbitration, agreement contained no express provision, as in *Gateway,* that is intended to modify scope of judicial review and, therefore, FAA default standard was applicable).

### III. GROUNDS FOR VACATUR

■ The FAA provides four grounds for vacating an arbitration award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10 (1999). In addition to the four statutory grounds, there are several common law grounds for vacating an arbitration award: (1) the arbitrator manifestly disregards the law,[5] (2) the award is against public policy,[6] and (3) the award is arbitrary or capricious.[7]

### IV. BREACH OF FIDUCIARY DUTY

#### A. Manifest Disregard of the Law

■ Tanox claims the arbitrators manifestly disregarded the law in finding the Lawyers did not breach their fiduciary duties. "Manifest disregard of the law" is a judicially created ground for vacating arbitration awards. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir.1995). Manifest disregard of the law is more than mere error or misunderstanding with respect to the law. *LaPrade v. Kidder, Peabody & Co., Inc.,* 246 F.3d 702, 706 (D.C.Cir.2001); *Jaros,* 70 F.3d at 421; *Health Servs. Mgmt. Corp. v. Hughes,* 975 F.2d 1253, 1267 (7th Cir.1992); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 265 (2d Cir.1989). Under this standard, the arbitrator clearly recognizes the applicable law, but chooses to ignore it. *Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.,* 274 F.3d 34, 36 (1st Cir.2001); *Missouri River*

---

**5.** *Bull HN Info. Sys., Inc. v. Hutson,* 229 F.3d 321, 331 (1st Cir.2000).

**6.** *Misco, Inc.,* 484 U.S. at 42, 108 S.Ct. 364.

**7.** *Brown v. ITT Consumer Fin. Corp.,* 211 F.3d 1217, 1222 (11th Cir.2000).

*Servs., Inc. v. Omaha Tribe of Neb.,* 267 F.3d 848, 855 (8th Cir.2001), *cert. denied,* 535 U.S. 1053, 122 S.Ct. 1909, 152 L.Ed.2d 820 (2002); *Brown,* 211 F.3d at 1223; *Williams v. Cigna Fin. Advisors, Inc.,* 197 F.3d 752, 762 (5th Cir.1999); *Jaros,* 70 F.3d at 421; *Health Servs. Mgmt. Corp.,* 975 F.2d at 1267. "To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties." *Carte Blanche (Singapore) Pte., Ltd.,* 888 F.2d at 265. Therefore, the court's "review for manifest disregard of the law does not open the door to extensive judicial review." *Dawahare,* 210 F.3d at 669. Accordingly, judicial review under this standard is "extremely limited." *Carte Blanche (Singapore) Pte., Ltd.,* 888 F.2d at 265; *see also Jaros,* 70 F.3d at 421 (stating manifest disregard of law is a "very narrow standard of review"). The party seeking to vacate an arbitration award bears the burden of demonstrating the arbitration panel acted in manifest disregard of the law. *LaPrade,* 246 F.3d at 706; *Brown,* 211 F.3d at 1223.

## B. Specific Breaches of Fiduciary Duty

Tanox claims the Lawyers breached their fiduciary duties in several ways. First, Tanox alleges the Lawyers knew the new business arrangement provision in the fee agreement was ambiguous, but failed to disclose to Tanox the material ambiguity and further failed to disclose their interpretation of that provision and the conflict of interest that provision created. Second,

Tanox alleges that during the settlement discussions, the Lawyers failed to disclose to Tanox that the proposed settlement would give rise to an "unexpected and massive claim for fees." Third, Tanox alleges the Lawyers prepared to sue and actually sued Tanox while still representing Tanox.

## 1. Representation Prior to Entering into Fee Agreement

Tanox claims the arbitrators' conclusion that the Lawyers did not owe any fiduciary duties to Tanox prior to the execution of the fee agreement on August 1, 1994, is in manifest disregard of the law. The arbitrators found the attorney-client relationship between the lawyers and Tanox began when the fee agreement was signed, not before then.[8]

 A fiduciary relationship exists between attorneys and clients as a matter of law. *Arce v. Burrow,* 958 S.W.2d 239, 246 (Tex.App.-Houston [14th Dist.] 1997) (op. on reh'g), *aff'd as modified,* 997 S.W.2d 229 (Tex.1999). The term fiduciary " 'refers to integrity and fidelity.' " *Id.* (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 512 (1942)). Therefore, the attorney-client relationship is one of "most abundant good faith," requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception. *Perez v. Kirk & Carrigan,* 822 S.W.2d 261, 265 (Tex.App.-Corpus Christi 1991, writ denied) (citing *Hefner v. State,* 735 S.W.2d 608, 624 (Tex.App.-Dallas 1987, pet. ref'd)).

---

8. In reaching that conclusion, the arbitrators explained:

The evidence persuades us that the Lawyers did not represent Tanox in the negotiation of the CFA and that Tanox did not look to or rely on the Lawyers for legal advice in the negotiations of the CFA. The weight of the evidence establishes that Tanox was represented by attorney David Anderson, Tanox's executive vice president and chief operating officer, in the negotiations of the CFA. Mr. Anderson was intimately involved in every aspect of the very lengthy negotiation process.

Tanox asserts it is "undisputed" the Lawyers did the acts about which its complains; therefore, the primary dispute is whether those acts constitute breaches of fiduciary duty under Texas law. However, before we can reach that issue, we must first determine whether an attorney-client relationship existed between the Lawyers and Tanox. *See Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380, 383 (Tex.App.-Corpus Christi 1994, no writ) (stating there must first be attorney-client relationship before duty arises).

■■■ The attorney-client relationship is a contractual relationship whereby an attorney agrees to render professional services for a client. *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex.App.-Houston [1st Dist.] 2000, no pet.). The relationship may be expressly created by contract, or it may be implied from the actions of the parties. *Sutton v. Estate of McCormick*, 47 S.W.3d 179, 182 (Tex.App.-Corpus Christi 2001, no pet.); *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.). The determination of whether there is a meeting of the minds must be based on objective standards of what the parties did and said and not on their alleged subjective states of mind. *Terrell v. State*, 891 S.W.2d 307, 313 (Tex.App.-El Paso 1994, pet. ref'd). A question of fact exists when the evidence does not conclusively establish the existence of an attorney-client relationship. *Sutton*, 47 S.W.3d at 182; *Kanow v. Brownshadel*, 691 S.W.2d 804, 805–06 (Tex.App.-Houston [1st Dist.] 1985, no writ).

■■■ In support of its assertion that an attorney-client relationship existed prior to the signing of the fee agreement, Tanox relies on selected portions of the record. First, Tanox relies on evidence that the Lawyers worked on the trade secret litiga-

tion prior to August 1994, and billed Tanox $600 for that work. Joe Osborne of Akin, Gump testified Michael Madigan requested that he review the time records in connection with the patent infringement litigation. Explaining that he was not aware of the date of the fee agreement and that he gave no consideration of the issue in his review of those records, Osborne included work performed prior to August 1, 1994, in the bill for the patent infringement litigation. Osborne testified that had he known of the date of the fee agreement, he would not have included that work in the bill.

Tanox also relies on Gerald Birnberg's testimony that he worked on a protective order in late July 1994, prior to the signing of the fee agreement. However, although Birnberg worked on the protective order prior to August 1, 1994, he explained that because the deadline for filing the motion was approaching, he performed preparatory work, but not substantive work, so that if the Lawyers entered into a fee agreement with Tanox, they would "be ready to step in and do the work on the protective order in short order." Tanox furthers points to Akin, Gump's time records, which refer to Tanox as the "client," not the "prospective" client. Birnberg's time entries, however, refer to Tanox as a "prospective client."

Tanox's chief executive officer, Nancy Chang, testified she thought Birnberg was her attorney prior to entering into the fee agreement because she trusted him and he helped put together a team of lawyers. Chang's further testimony, however, contradicts her belief that Birnberg was already her attorney. She testified "[Birnberg] certainly said he wanted to be my attorney. Robinson wanted to represent us, excited about the case." In any event, Chang's subjective belief that Birnberg was her attorney is not relevant to this inquiry. The determination of whether

there is a meeting of the minds is based solely on objective standards of what parties did and said, not their alleged subjective states of mind. *See Terrell,* 891 S.W.2d at 313.

Tanox also argues a fiduciary relationship between an attorney and his client extends to preliminary consultations concerning the possible retention of the attorney. *See Nolan v. Foreman,* 665 F.2d 738, 739 n. 3 (5th Cir.1982). In *Nolan,* the attorney was retained to appeal a conviction for marijuana trafficking. *Id.* at 739. The court rejected the attorney's argument that there was no attorney-client relationship prior to reaching an agreement on the fee. *Id.* at n. 3. Instead, observing that the parties may manifest an intent to create an attorney-client relationship explicitly or by their conduct, the *Nolan* court found the attorney's fiduciary duties attached when he entered into a discussion of the client's legal problems "with a view toward undertaking representation." *Id.*

We find *Nolan* distinguishable from the facts of this case. For example, while the Lawyers and Tanox were involved in the negotiation of the fee agreement, Tanox was still considering other attorneys for representation. For example, on July 21, 1994, Anderson received a letter from Osborne J. Dykes of Fulbright & Jaworski stating, "As per your request of Tuesday, July 19, 1994, we have endeavored to prepare a preliminary proposal to Tanox Biosystems, Inc. ('Tanox') for the engagement of Fulbright & Jaworski L.L.P ('Fulbright & Jaworski') to represent Tanox' interest in connection with the referenced matter."

Moreover, the fee agreement states, "the attorneys have agreed to provide such representation ... subject to the following terms, conditions, and understandings." Anderson acknowledged that representation is conditioned upon agreeing to the terms of the fee agreement. In other words, if the terms in the fee agreement are not agreed to then there is no representation. An attorney's agreement to represent a client may be conditioned on the negotiation of a fee arrangement. RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 14 cmt. e (2000). The fee agreement also provides it was the subject of negotiations, each party had the opportunity to consult with counsel during negotiations, and there is no presumption of construction of the fee agreement against either party. Anderson also conceded that these terms are evidence of arm's-length negotiations.

Furthermore, the evidence also showed Tanox would not allow the Lawyers to review any information it considered proprietary until the parties had signed the fee agreement. For example, Birnberg testified that although Tanox told the Lawyers its 1990 agreement with Ciba–Geigy provided royalties to Tanox, Tanox would not allow the Lawyers to review that agreement because Tanox said it was "proprietary" and "declined to make those documents available to [them] until they hired [them] as their lawyers." Similarly, Mike Mueller testified he did not have the impression that Anderson viewed him as someone "to be trusted with confidential information prior to the August 1st agreement" and, accordingly, Anderson would not give him any confidential information until he was Tanox's attorney.

Finally, on August, 1, 1994, Birnberg wrote Chang expressing his desire that the Lawyers and Tanox would enter into a "successful" attorney-client relationship:

Thank you for meeting with Ken Robinson, Mike Mueller, and me to discuss possible representation of Tanox Biosystems, Inc. by Akin, Gump, Strauss, Hauer & Feld, L.L.P., Robinson Law Firm, and Williams, Birnberg & Andersen, L.L.P. in connection with the anti-

IgE litigation with Genentech, ... After meeting with you and reviewing the materials we have been provided, the three firms collectively feel sufficiently optimistic about the prospects for a successful outcome of this litigation that we are willing to undertake representation of Tanox in its affirmative claims against Genentech and the others (the "trade secret litigation") on a contingency fee basis. Accordingly, on behalf of the three firms, I enclose copies of two proposed Representation Letter Agreements which set forth the terms upon which we would propose to undertake representation both in that case and in the patent infringement litigation.

\* \* \*

I look forward to hearing from you and, hopefully, to a mutually rewarding and successful attorney-client relationship.

Because the evidence does not conclusively establish the existence of an attorney-client relationship between the Lawyers and Tanox, whether such a relationship existed was a question of fact for the arbitrators. *See Sutton,* 47 S.W.3d at 182; *Kanow,* 691 S.W.2d at 805–06. The arbitrators' finding that

the Lawyers did not represent Tanox during the negotiation of the fee agreement is not in manifest disregard of the law. This issue is overruled.

## 2. New Business Arrangement Provision

 Tanox contends the arbitrators' conclusion that the Lawyers did not owe Tanox any fiduciary duties in connection with the preparation of the fee agreement manifestly disregards Texas law requiring that an attorney must inform the client of the basis of his rate or fee at the outset of the matter. *See Levine v. Bayne, Snell & Krause,* 40 S.W.3d 92, 96 (Tex.2001).[9] Specifically, Tanox contends the Lawyers knew the "new business arrangement" provision was ambiguous. That is, the Lawyers believed they could recover a percentage of the royalties Tanox was entitled to receive under the 1990 Ciba–Geigy agreement, while Tanox believed the Lawyers' fee was not based on those royalties.

In support of this contention, Tanox relies on selected portions of a July 27, 1994, memorandum from Birnberg to Ken Robinson, which states:

It has suddenly and finally occurred to me (in the shower this morning) what

9. The arbitrators found Tanox was represented by counsel in the negotiation of the fee agreement. Specifically, the arbitrators observed that Tanox's legal counsel, Anderson, was "intimately involved in every aspect of the very lengthy negotiation process" and that Anderson's "competence and level of sophistication in that undertaking was comparable to that of the Lawyers." In this regard, the arbitrators found "it difficult to believe that Mr. Anderson would have permitted Tanox's chief executive officer to sign an agreement which contained provisions which, as Tanox contends, Mr. Anderson did not understand or which a competent attorney would know or should know to be illegal or unconscionable."

Noting the fee agreement provides Tanox has availed itself of legal representation independent of that of the attorneys, the arbitrators stated, "Tanox's contention that it relied on representations of the Lawyers rests on the supposition that neither its chief executive officer, Dr. Nancy Chang, nor its executive vice president and chief operating officer, David Anderson, knew the plain meaning of this plain language or were so naive as to believe it to be meaningless. The credible evidence simply does not support this supposition." Instead, the arbitrators found that the evidence established that the fee agreement was negotiated at arm's-length by sophisticated parties of comparable knowledge and bargaining power, rejecting "Tanox's assertion that it was unsophisticated, inexperienced or reliant on the Lawyers."

Tanox' hang-up is on the 10% versus 25% royalty issue *and I think they're right.* The "settlement by new business arrangement" we have been talking about would involve, essentially, Genentech taking over Ciba–Geigy's position in the Tanox/Ciba "collaboration" arrangement. . . .

The problem is that the Ciba–Tanox deal already provides that Tanox is to receive a royalty from that existing arrangement. (I forget what the percentage is, but think it [sic] to be around 8%). If the litigation ends with Genentech simply taking over Ciba's position—and nothing more—that "new business arrangement" would have no incremental value (over and above what they already have) to Tanox whatsoever, since they already have Ciba in that position and agreeing to pay that royalty[.] Yet, under our fee agreement, we would be entitled to receive a percentage of the royalties Tanox received from that "new business arrangement," notwithstanding the fact that they would be in exactly the same position they are in right now and before the litigation (except for having a different "partner"—Genentech rather than Ciba).

Originally, David Anderson sought to address this unfairness (to Tanox) by proposing that the percentage provided for in the contingent fee agreement would be applied, but only to the portion of the royalties which exceeds the amount they are presently entitled to under the Ciba agreement. You countered with a proposal that the percentage be applied to the entire amount of royalties received, whether those royalties result from our efforts or from Tanox' present contract with Ciba, but at a reduced rate of 10% (rather than the 25%–40% percentages which we are entitled to receive on "damages" which are obtained for Tanox from *our* efforts).

Tanox agreed to your proposal in that regard.

Tanox is, in my judgment, entirely justified in resisting paying us a fee based on what they are already entitled to receive under the Ciba contract (even if Genentech takes over the Ciba position in the Ciba contract). We, on the other hand, are entirely justified in requesting (demanding) a fee based on the amount by which any royalties they become entitled to receive exceeds the amount they are presently entitled to receive under the Ciba contract. Unfortunately, straightening this out at this stage to make it more reflective of what we should actually receive would probably and rightly be perceived as "changing the deal": we [you] said, we'll take 10% of *all* royalties received (whether from a new business arrangement or from a judgment against Genentech ordering them to pay a "royalty" as damages), rather than 25% or 33⅓% or 40% or whatever of any *new* or *increased* royalties Tanox becomes entitled to receive on account of our efforts. Well, a deal is a deal; we made the deal and, in my judgment, we should stick to it. Actually, I *think* it is entirely possible the "deal" may actually work to our favor, rather than to our detriment, but only time will tell.

Having said all that, my hope is that *you* can explain it to Mike so that he will (a) not feel we are being "ripped off" by the client (I don't think we are on this issue; in fact, I think they are essentially right) and (b) not tinker with the provisions of the draft agreement *in this regard.* My fear is that if we try to "tie down" that the 10% applies to *all* royalties, whether resulting from our efforts or otherwise, we will spook the client even more and it just ain't worth it. I think the agreement in its present

form (in the section entitled Settlement by New Business Arrangement) would sufficiently covers [sic] the situation by entitling us to 10% of "any future payments (such as ... royalties ...) received by Tanox on account of such new business arrangement."

In retrospect, we might have tried to distinguish between "royalties" resulting from a new business arrangement and "royalties" awarded by a court as damages after trial, but we didn't and I think it is too late now to insist on (or even propose) a different approach to this issue.

If what we end up with in this case is nothing more than Genentech taking over Ciba's position *and nothing more* (and if world-wide sales amount to $1 billion per year and assuming an 8% royalty in the current Ciba–Tanox agreement), the lawyers would receive $8 million per year for nearly 40 years for achieving *nothing!* That's not a bad deal.[10]

Tanox claims Birnberg's memorandum establishes that the Lawyers knew there were conflicting interpretations. Birnberg testified Robinson called him on July 26, stating he did not understand why the Lawyers would recover only 10% of the royalties awarded at trial instead of the incremental percentages they would recover on other damages. Robinson wanted royalties awarded at trial to be distinguished from royalties recovered though settlement. According to Birnberg, Anderson did not believe the Lawyers should recover the full percentages on all royalties Tanox received from Genentech, but only on the incremental difference between the royalties under the 1990 Ciba–Geigy agreement and royalties recovered from Genentech. Birnberg explained the problem with this approach was that it was not possible to distinguish at what point Tanox would receive incremental royalties as opposed to the base royalties under the Ciba–Geigy agreement. Therefore, it was suggested as a compromise that the fee be based on 10% of all royalties regardless of whether Tanox recovered the royalties under the Ciba–Geigy agreement or from the trade secret lawsuit.

Birnberg reminded Robinson the Lawyers had agreed to the compromise. Birnberg felt that trying to craft a new deal in which the Lawyers would receive 25%, 33⅓% or 40% of royalties received from Genentech rather than 10% of all royalties would be changing "the deal" at the last minute. Concerned Robinson would try to renegotiate that provision with Anderson, Birnberg wrote this memo.

Tanox argues the "tie down" language in Birnberg's memorandum indicates the Lawyers knew the provision was ambiguous. Robinson suggested to Birnberg that additional language was needed to "tie down" the agreement that 10% applied to all royalties. Birnberg, however, explained that after rereading the draft of the fee agreement, he believed the language regarding the Lawyers' recovery on royalties was sufficiently clear. Birnberg explained that if the Lawyers tried to "tie down" something that was already clear, then Tanox might believe the Lawyers were "reaching for something [they were] not really reaching for."

Tanox further contends the Lawyers chose not to reveal to Tanox their interpretation of the "new business arrangement" provision rather than "spook the client." Birnberg explained that Chang had called him the previous day because she was concerned the Lawyers would recover fees on other Tanox programs such

---

**10.** Emphasis in original.

as its AIDS program. In light of this conversation with Chang, Birnberg was concerned that trying to clarify the language would "play right into the fear that Nancy had expressed to me the previous day, that was going to spook them even more."

Moreover, Birnberg testified the calculation of the fee on royalties was discussed with Tanox at a meeting on July 19, 1994. As previously explained, Anderson did not believe the lawyers should recover the full incremental percentages on royalties Tanox was already entitled to receive under the Ciba–Geigy agreement; however, it was not possible to distinguish royalties received under the Ciba–Geigy agreement from royalties received from the Genentech litigation. Robinson, therefore, proposed that the Lawyers recover 10% of all royalties, both royalties received from the Ciba–Geigy agreement and those received from the collaboration with Genentech. Indeed, Birnberg's July 27, 1994, memorandum supports his testimony:

> Originally, David Anderson sought to address this unfairness (to Tanox) by proposing that the percentage provided for in the contingent fee agreement would be applied, but only to the portion of the royalties which exceeds the amount they are presently entitled to under the Ciba agreement. You countered with a proposal that the percentage be applied to the entire amount of royalties received ... but at a reduced rate of 10%.... Tanox agreed to your proposal in that regard.

Furthermore, in a conversation with Robinson on July 27, Anderson confirmed the "new business arrangement" provision covered all royalties. Finally, a review of the drafts of the fee agreement show numerous interlineations and deletions supporting the Lawyers' assertion that this provision was negotiated by the parties. The arbitrators' finding that the Lawyers were not required to disclose that their fee was based on royalties received under the 1990 Ciba–Geigy agreement is not in manifest disregard of the law.[11] This issue is overruled.

### 3. Conflict of Interest

█ Tanox claims the arbitrators' failure to find that the Lawyers breached their fiduciary duty by creating, and failing to disclose, a conflict of interest with respect to the settlement by new business arrangement and their resulting fee is in manifest disregard of the law. Tanox specifically complains the Lawyers "could claim this windfall fee only if they could settle the trade secret litigation as part of a new business deal. If the case had been tried to judgment, however, the Lawyers could not possibly have claimed the windfall fee." *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, cmt.6 (providing once the attorney and his client have agreed to a fee arrangement, the attorney should not handle the matter in such a way that furthers the attorney's financial interests to the detriment of the client). Thus, Tanox maintains that if the Lawyers had disclosed the conflict of interest, it could have settled differently or tried the case to judgment.[12]

---

**11.** Tanox further argues the fee agreement is voidable because it violates several rules of professional conduct. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.02, 1.03, 1.04, 1.06, and 1.08, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9). While generally citing several rules of professional conduct, Tanox has failed to present any argument in support of this assertion, thereby waiving this complaint on appeal. TEX.R.APP. P. 38.1.

**12.** The arbitrators stated, "In summary, nothing presented by Tanox persuades us that Tanox did not achieve precisely the deal it desired and knowingly sought."

Tanox's purpose in suing Genentech belies its assertion that it would have sought a different settlement or pursued the lawsuit to judgment. Genentech wanted to take Ciba–Geigy's place under the 1990 Ciba–Geigy agreement for the development of the anti-body. Under Genentech's proposal, however, Genentech would continue to develop its own anti-IgE program in addition to collaborating with Tanox on its program, thereby making Genentech both Tanox's partner and competitor. Birnberg explained that Chang and Anderson were concerned the Tanox/Genentech program would be eliminated, leaving only the development of Genentech's product and, therefore, Tanox would not be getting "its royalties on this part of the pie." Birnberg testified Chang told him Genentech had offered to pay Tanox $25 million for taking Ciba–Geigy's place, while still developing its own program, but Tanox rejected the offer. Chang wanted at least $100 million. Ultimately, Tanox wanted an arrangement which would (1) allow Genentech to step into Ciba–Geigy's shoes, and (2) provide leverage to make collaboration with Genentech, which could result in the elimination of Tanox's program, economically viable for Tanox. Therefore, according to Birnberg, the lawsuit was not filed with the expectation that it would ultimately go to trial.

Anderson similarly testified one reason for filing the lawsuit was to continue discussions about a possible business arrangement with Genentech. Eric Mirabel also testified that with the threat of litigation, Genentech would be more willing to enter into a settlement, which included a business deal with Genentech and the settlement of Tanox's patent rights.

Tanox further asserts the new business arrangement bore no relation to the lawsuit. Chang's own comments to Robinson negate this assertion. During settlement negotiations, Chang persuaded Genentech to add a $20 million milestone payment if they achieved $300 million in sales. In this regard, Chang said to Robinson: "Kenny, you owe me a big tip. I just got us a $20 million bonus when we get to sales of $300 million." There would have been no reason for Chang to make that comment if the new business arrangement had no relation to the trade secret lawsuit.

Finally, Tanox contends the Lawyers intended to claim large fees if they could combine a settlement with a new business arrangement with Genentech, even if the settlement "achieved nothing."[13] Birnberg acknowledged that from Tanox's perspective, if all that was achieved was Genentech stepping into Ciba–Geigy's shoes, then nothing would have been achieved, but the Lawyers would still recover a large fee. Birnberg, however, explained Tanox's surviving to receive $80 million per year for 40 years would be possible only because the lawyers "were there long enough to keep them propped up to where they didn't get quashed by Genentech, which is what their fear was, then we would have earned that fee."[14]

13. This is in reference to Birnberg's July 27, 1994 memorandum in which he states:

If what we end up with in this case is nothing more than Genentech taking over Ciba's position *and nothing more* (and if world-wide sales amount to $1 billion per year and assuming an 8% royalty in the current Ciba–Tanox agreement), the lawyers would receive $8 million per year for nearly 40 years for achieving *nothing!* That's not a bad deal.
(Emphasis in original).

14. The following exchange occurred between Birnberg and one of the arbitrators:
ARBITRATOR HOOVER: Can I ask a question here? Are you saying when you say nothing here, what you mean is what might appear to be nothing?

Moreover, Chang understood the fees the Lawyers could recover from a new business arrangement, when she told her former husband, Tse Wen Chang, before the case settled that the lawyers could be entitled to $100 to $200 million in fees. The arbitrators' failure to find that the Lawyers had placed their own interests ahead of achieving the best result is not in manifest disregard of the law. This issue is overruled.

### 4. Litigation Against Tanox

■ Tanox claims the arbitrators manifestly disregarded the law in finding the Lawyers no longer represented Tanox when they prepared to litigate against Tanox and filed the motion to intervene seeking their attorney fees in federal court on July 16, 1996, and, therefore, did not breach any fiduciary duties. With regard to this conclusion, the arbitrators found (1) "Tanox had, without consultation, supplanted the Lawyers with other counsel," and (2) the trade secret litigation had effectively ended on January 30, 1996.

Tanox maintains the fact that Madigan directed an associate at his law firm to look at the issue of possible litigation against Tanox over attorney fees conclusively establishes the Lawyers were preparing to sue Tanox while still representing Tanox. Beginning in February 1996, Madigan "had concerns" about Anderson, and that by May 1996, he believed there could be a problem with the Lawyers' recovery of their fee. Madigan's concerns included Anderson's (1) not wanting any of the Lawyers to attend a meeting with him and Ciba–Geigy in Switzerland to discuss the new business arrangement, even

though Madigan and Birnberg had offered to go; (2) wanting to draft the settlement documents without any assistance by the Lawyers; and (3) evasiveness when Madigan attempted to discuss the mechanics of the closing, which included wiring instructions.

According to the Lawyers, after reaching the settlement on January 30, 1996, all that remained was for Ciba–Geigy to agree to the new business arrangement. The Lawyers claim they did not have any substantive involvement in the drafting of the settlement documents. Madigan stated he did very little work on the litigation after the parties reached a settlement. Anderson refused Birnberg and Madigan's offer to attend a meeting with Ciba–Geigy in Switzerland and to help draft the settlement documents. Birnberg testified Anderson was the primary draftsman for Tanox in preparing the settlement documents. Anderson told Birnberg he had more knowledge about biotech contracts, and he was an expert in contract negotiation. Birnberg explained his only involvement in the drafting of the settlement documents was in late May 1996, when Anderson sent him a draft settlement agreement which was "in nearly final form" for his review. Birnberg spent several hours reviewing the draft and suggested minor, but not substantive, revisions. This was the only time Birnberg saw any draft of the settlement documents.

In addition to their assertion that they had no substantial involvement in the settlement after January 30, 1996, the Lawyers claim Tanox had replaced them with other counsel in the drafting of the settle-

[BIRNBERG]: Yeah, absolutely, nothing from their perspective. They would say, "Oh, well, we ended up with the same thing as you got before." It's still achieving something. It would have achieved a whole lot, by the way. It would have achieved having

the benefit of Genentech's far superior marketing, having the benefit of Genentech's scientists, having the benefit, perhaps, of Genentech not being in the market as a competitor....

ment documents. Tanox asserts it hired another attorney, Bernard Saxe of Foley & Lardener, only to review a provision in the business arrangement relating to Genentech's opposition to one of Tanox's patents in the European Patent Office, not to handle any aspect of the litigation of which the Lawyers were the attorneys of record. Anderson, however, also testified he had discussed the settlement agreement with Tanox's former counsel, Ed Harrell.

The parties signed the settlement agreement on July 8, 1996. Madigan first learned about the July 8 settlement when he read about it the newspaper. Madigan discussed with Anderson and Genentech's general counsel, David Beck, the need to set up an escrow account. Madigan informed Anderson when the escrow account had been set up.

Under the fee agreement, "Tanox expressly agree[d] that it [would] not obtain any settlement nor receive any funds relating to this matter without first consulting with and making full disclosure to the successor attorneys." Unbeknownst to the Lawyers, on July 12, 1996, Genentech wired $16 million to Tanox directly. Madigan learned of the $16 million wire transfer on July 15, from Genentech's general counsel. Madigan went to Robinson's office, where he and Robinson called Tanox. Madigan informed Anderson that he had learned of the $16 million payment. In response, Anderson told Madigan that he would have to check on the wire transfer and they would have to discuss the amount the Lawyers would recover.

Madigan then wrote Anderson and requested that Tanox wire $6 million to Akin, Gump's account and $2 million to Robinson's account. Madigan reminded Anderson that, "our contract requires pay-

ment of these additional funds 'immediately' upon the receipt of the $16 million by Tanox." Madigan further warned the joint motion to dismiss would not be filed until the Lawyers received the $8 million pursuant to the fee agreement.[15] Robinson also wrote Anderson and Chang, instructing them to wire $8 million to Lawyers, and further stating, "I cannot leave town or participate in a dismissal Order [sic] of the case until our contract is honored and all interest on $8,000,000 is paid."

On July 16, in response to Madigan's letter, Anderson informed Madigan that "determining what was paid to settle such litigation is fundamental to establishing the basis for calculation of the contingent fee that is payable." Anderson explained that Tanox asked Genentech to advise it of the amount for which it paid to settle the trade secret litigation. Anderson states Genentech paid $7 million to settle the trade secret litigation. Therefore, according to Anderson, the $16 million payment was not related to the settlement of the trade secret litigation.

Anderson gave the Lawyers conflicting instructions. First, he ordered the Lawyers to file the dismissal papers. However, he also advised Madigan the Lawyers should have no further direct contact with Tanox, but, instead, Tanox had retained Ed Harrell to represent it in concluding the settlement and in any disputes with regard to the fee agreement. Anderson wrote:

> [W]e believe that the threats made by you and Ken to delay dismissal of the lawsuits until you have been paid are both highly unethical conduct and constitute a breach of both our trade secret lawsuit and patent litigation agreements.

---

**15.** Madigan wrote: "The joint motion and dismissal order have *not* yet been filed. We're still awaiting the finalized documents. These documents will *not* be filed until we receive confirmation of the wire transfer of the funds." (Emphasis in original).

Unfortunately, it is now clear that "our attorneys" have been working for their own interests, not Tanox's. Therefore, Tanox demands that today you either sign and file the dismissals or withdraw as Tanox's counsel.

\* \* \*

We are hopeful that conclusion of our agreements as provided above can be quickly accomplished and we can end our relationship in an amicable manner. Finally, however, we would like to let you know that based on the threats made by you and Ken and on the adversarial position taken, *we do not believe it is appropriate or advisable for us to continue to deal directly with any of you in connection with this matter and we have engaged Mr. Ed Harrell of Hughes, Watters & Askanase to represent us in concluding the above and any other matters* which may arise in connection with the agreements between us.[16]

On July 16, 1996, the Lawyers filed under seal a motion to intervene seeking attorney fees in connection with their work performed in the trade secret litigation. In its response to the motion to intervene, Tanox stated, "This case' is settled and settlement agreements [sic] executed by the parties. The form of the motion(s) and dismissal order(s) was agreed to by the parties except Ciba–Geigy, and the remaining issue(s) are apparently virtually resolved. The dispute is solely between TANOX and the *Former* Attorneys." (Emphasis added).

On August 1, 1996, Harrell wrote to David Donahoe of Akin, Gump, complaining that Madigan, Robinson, and Birnberg had signed the motion to dismiss when they had no authority to do so on behalf of Tanox as of July 15, 1996:

> I was surprised to learn that the signatures on the dismissal motion of Madigan, Robinson and Birnberg were apparently the product of a Mike Madigan request. The *adversarial position of Tanox's former attorneys became immutable on July 15, 1996.* The former attorneys had no authority to speak or act on Tanox's behalf. Their presumption to act on Tanox's behalf is not only of grave concern but delayed the filing of the dismissal papers.[17]

After the settlement had been reached on January 30, Tanox did not require the assistance of the Lawyers in obtaining Ciba–Geigy's agreement to the settlement or in drafting the settlement documents. Tanox used its in-house counsel and other outside counsel for those tasks. After the Lawyers demanded payment of their fees, but before it had filed the motion to intervene, Tanox informed the Lawyers it had hired another attorney to conclude the settlement and to represent it with regard to the fee agreement, and that the Lawyers should not contact Tanox directly. Tanox made it clear to the Lawyers that as of July 15, the Lawyers no longer represented it.

Whether the Lawyers and Tanox still had an attorney-client relationship was a question of fact for the arbitrators. The arbitrators' finding that the Lawyers did not breach any fiduciary duty by preparing to file and actually filing the motion to intervene because the Lawyers no longer represented Tanox is not in manifest disregard of the law.[18] This issue is overruled.

---

16. Emphasis added.

17. Emphasis added.

18. Tanox complains the Lawyers' preparation of documents in anticipation of litigation is tantamount to an admission that they breached their fiduciary duty. *See Resolution Trust*

## C. Public Policy

Tanox further claims the award should be vacated because the arbitrators' findings that the Lawyers did not breach their fiduciary duty (1) violate public policy, and (2) are arbitrary and capricious. Tanox argues the arbitrators' findings do not protect the integrity of the attorney-client relationship, but, instead, condone an attorney's breach of fiduciary duty and undermine the relationship of trust between attorneys and their clients. There is no broad judicial power to set aside an arbitration award as against public policy. *Misco*, 484 U.S. at 43, 108 S.Ct. 364. Therefore, the public policy exception is narrow and must satisfy certain principles. *Eastern Assoc. Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 63, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). An arbitration award is unenforceable on public policy grounds only when the award violates some " 'explicit public policy' " that is "well-defined and dominant, and is ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)).

An arbitration award will not be vacated as arbitrary and capricious, unless it " 'exhibits a wholesale departure from the law [or] if the reasoning is so palpably faulty that no judge, or group of judges could ever conceivably have made such a ruling.' " *Indus. Risk Insurers v. M.A.N.*

*Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 n. 16 (11th Cir.1998) (quoting *Brown v. Rauscher Pierce Refsnes, Inc.*, 994 F.2d 775, 781 (11th Cir.1993)). In other words, the court will not vacate an award as arbitrary and capricious unless it cannot infer any ground for the award from the facts. *Brown*, 211 F.3d at 1223.

If the court determines the arbitrators did not manifestly disregard the law, then it should also conclude the award neither violates public policy nor is arbitrary and capricious. *See Gallus Invs., L.P. v. Pudgie's Famous Chicken, Ltd.*, 134 F.3d 231, 234 n. * (4th Cir.1998). Because the arbitrators did not manifestly disregard the law, its decision likewise neither violates public policy nor is arbitrary and capricious. This issue is overruled.

### D. Fee Forfeiture Analysis & Damages

Tanox claims it is entitled to, on remand, a fee forfeiture analysis under *Burrow v. Arce* for the attorneys' breach of their fiduciary duties. *Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex.1999). Because of our disposition of Tanox's issues concerning breach of fiduciary duty, we need not address this issue and it is overruled.

### E. Unconscionable Attorney Fees

Tanox claims the arbitrators manifestly disregarded the law by not finding the Lawyers' fees to be unconscionable. An attorney may not charge an illegal or unconscionable fee. Tex. Disciplinary R. Prof'l Conduct 1.04(a). A presumption of unfairness or invalidity attaches to a fee agreement and the attorney bears the burden to prove the agreement is fair and

---

*Corp. v. H——, P.C.*, 128 F.R.D. 647, 649 (N.D.Tex.1989) (stating that any claim by attorney that materials were created in anticipation of litigation with client would be an admission of a breach of fiduciary duty).

However, because the arbitrators determined the Lawyers no longer represented Tanox by that time, the preparation of those documents does not constitute a breach of the Lawyers' fiduciary duty.

reasonable. *Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964). However, "a fee arrangement negotiated at arm's-length with an experienced business client would rarely be subject to question. On the other hand, a fee arrangement with an uneducated or unsophisticated individual having no prior experience in such matters should be more carefully scrutinized for over-reaching." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04 cmt 8.

 The arbitrators found Tanox was a sophisticated party, which was represented by competent counsel in the negotiation of the fee agreement. The parties agreed the fee agreement was the subject of negotiations and that Tanox had the opportunity to consult independent counsel during negotiations. Similarly, Anderson acknowledged the fee agreement was negotiated at arm's-length. Moreover, Tanox understood the Lawyers could recover fees on all royalties received by it. Under these circumstance, *no presumption of unfairness attached to the fee agreement* and, therefore, the failure to find that the Lawyers' fees were unconscionable is not in manifest disregard of the law. This issue is overruled.

### V. WORK PRODUCT PRIVILEGE

 Tanox claims the arbitrators manifestly disregarded the law in sustaining the Lawyers' assertion of work product privilege regarding documents and time entries the Lawyers prepared while they were representing Tanox. Under the FAA, the courts have the authority to vacate an arbitration award "[w]here the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). This, however, is a narrow ground for vacatur. An evidentiary error must not be merely an error of law; rather, such error must so affect the rights of

a party that it was deprived of a fair hearing. *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.,* 915 F.2d 1017, 1023 (5th Cir. 1990) (quoting *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir.1968)). Assuming that the arbitrators erred in refusing to consider the disputed evidence, to vacate the arbitration award, the arbitrators' error must have been made in bad faith or the error must be so gross as to constitute affirmative misconduct. *Misco, Inc.,* 484 U.S. at 40, 108 S.Ct. 364. The arbitrator is the sole judge of the admissibility and relevancy of the evidence submitted in an arbitration proceeding. *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901,* 763 F.2d 34, 39 (1st Cir.1985) (quoting M. Hill & A. Sinicropi, *Evidence in Arbitration* 22 (1980)).

 Tanox claims the work-product privilege is not available to the Lawyers because an attorney cannot anticipate litigation against a current client without breaching his fiduciary duty. In this case, however, the arbitrators found the Lawyers no longer represented Tanox at the time the subject documents were created. Because that finding is not in manifest disregard of the law, the arbitrators' decision not to order the production of those documents also is not in manifest disregard of the law. This issue is overruled.

### VI. ESSENCE OF THE CONTRACT

 Tanox claims the arbitration award fails to "draw its essence" from the fee agreement. To draw its essence from a contract, an arbitration award "must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the ... agreement.... [T]he award must, in some logical way, be derived from the wording or purpose of the contract." *Local Union 59,*

*Int'l Bhd. of Elec. Workers, AFL–CIO v. Green Corp.,* 725 F.2d 264, 268 (5th Cir.), cert. denied, 469 U.S. 833, 105 S.Ct. 124, 83 L.Ed.2d 66 (1984) (quoting *Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co.,* 415 F.2d 403, 412 (5th Cir.1969)). When resolving disputes concerning the application of a contract, and no dishonesty had been alleged on the part of the arbitrator, an arbitrator's " 'improvident, even silly, factfinding' " does not provide a basis for the court not to uphold the award. *Major League Baseball Players Ass'n,* 532 U.S. at 509, 121 S.Ct. 1724 (quoting *Misco, Inc.,* 484 U.S. at 39, 108 S.Ct. 364). If the arbitrator is even arguably construing the contract and acting within the scope of his authority, the fact that the court is convinced he committed serious error is not sufficient to vacate the award. *Id.* (quoting *Eastern Associated Coal Corp. v. United Mine Workers of Am.,* 531 U.S. at 62, 121 S.Ct. 462). In other words, as long as the arbitrators' decision draws its essence from the contract, the award must be confirmed. *Misco, Inc.,* 484 U.S. at 36, 108 S.Ct. 364.

■■■ Tanox contends the arbitration award fails to draw its essence from the fee agreement for two reasons. First, the arbitrators ignored the fact that the attorney fees based on Tanox's recovery under a new business arrangement were limited to payments "received by Tanox *as a result of the litigation,* on account of such new business arrangement." (Emphasis added). Tanox complains the arbitration panel erroneously found the new business arrangement was a result of the trade secret litigation and, therefore, the attor-

neys were awarded fees based on preexisting royalties and patent licensing fees which had no relation to the trade secret litigation.[19]

Anderson testified the trade secret litigation was not a consideration with regard to the new business arrangement among Tanox, Genentech, and Ciba–Geigy. Anderson, however, further testified the dispute, which included the patent infringement and trade secret litigation, was resolved by a new business arrangement and "the settlement recovery could certainly include the best business deal that was based on ... that lawsuit." Birnberg similarly testified the parties agreed the settlement of the disputes concerning Tanox's patent rights and the merger of the Genentech and Tanox/Ciba–Geigy anti-IgE projects were part of the settlement of the litigation pending among Genentech, Tanox, and Ciba–Geigy. Birnberg further testified the merger of the anti-IgE projects was a new business arrangement within the meaning of the fee agreement. Tse Wen Chang likewise testified he could not think of any way the litigation could be settled by a new business arrangement that would not be based on the patents.

Second, Tanox contends the fee agreement limits the type of future payments on which attorney fees can be calculated to payments "received from the defendants." Tanox argues because Ciba–Geigy was not a defendant in the trade secret litigation, attorney fees cannot be based on royalty payments existing under the 1990 Ciba–Geigy agreement. The fee agreement "contemplated that the dispute between

---

19. The arbitrator explained the new business arrangement was an integrated whole, with dependent promises and conditions. "Tanox attempted in argument to exclude certain elements from the purview of the new business arrangement by classifying them for fee purposes as not 'results of the litigation.' " How-

ever, "[n]othing in the general language of the [fee agreement] suggests the propriety of a 'cafeteria' approach. If Tanox had wanted to carve out exceptions, ... it had the burden to do so. The [fee agreement] does not contemplate a divisible 'settlement.' "

Tanox and the defendants might be resolved (in whole or in part) by some business arrangement whereby Tanox and one or more defendants engage in business together...." This provision does not limit a new business arrangement to Tanox and Genentech only. It merely states the dispute may be resolved by Tanox and Genentech engaged in business together, but does not exclude the possibility that Tanox and Genentech would do business with a third party. The arbitrators' award draws its essence from the fee agreement. This issue is overruled.

**VII. ARBITRATION OF TANOX'S TORT CLAIMS**

■■■ Tanox claims the trial court erred in submitting its breach of fiduciary duty and other tort claims to arbitration because the fee agreement provided arbitration for claims relating only to the breach of the fee agreement, not tort claims. Both federal and state law favor the arbitration of disputes. *In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 484 (Tex.2001). A party, however, cannot be compelled to submit to arbitration a dispute he has not agreed to submit. *PaineWebber Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 462 (5th Cir.2001). On the other hand, any doubts concerning the scope of arbitrable issues, should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir.), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993) (explaining that in determining whether arbitrator exceeded jurisdiction, court resolves all doubts in favor of arbitration). Therefore, " 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue,' " arbitration

should not be denied. *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (quoting *Commerce Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 338 (5th Cir.1984)).

■■■ Tanox contends the fee agreement limits arbitration to issues involving breach of the agreement. The arbitration clause states:

> Any actual or potential breach of this agreement by a party is to be brought to that party's attention promptly. Upon request of a party, a meeting shall be convened among the parties to attempt to resolve any issues relating to such actual or potential breach. If the parties are unable to resolve such issues or if the parties cannot resolve *any other issues* which may require further negotiations and agreement, any party may, by written request, require that any such unresolved issues be submitted to binding arbitration ...

Contrary to Tanox's assertion, we conclude the inclusion of the language "any other issues which may require further negotiations and agreement" in the arbitration clause is broad enough to include related tort claims.

■■■ In any event, a review of the record reflects that Tanox specifically requested that its breach of fiduciary duty and other tort claims be submitted to arbitration. For example, in its motion to compel arbitration, Tanox states, "[t]he representation agreement (p.11) requires arbitration of *all disputes* between Former Attorneys and TANOX." (Emphasis added). Moreover, in a written notice to the Lawyers, Tanox specifically demanded arbitration of "the enumerated claims," including claims for breach of fiduciary duty and legal malpractice. "A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision

is unfavorable, then challenge the authority of the arbitrators to act." *Ficek v. Southern. Pac. Co.*, 338 F.2d 655, 657 (9th Cir.1964); *see also Bull HN Info. Sys., Inc.*, 229 F.3d at 332 (stating " 'the arbitrator's interpretation of the scope of the issue submitted to him is to be treated with great deference' and 'must be upheld so long as it is rationally derived from the parties' submission' ") (citations omitted). Accordingly, Tanox is estopped to argue that its tort claims were not arbitrable.

Tanox argues that even though it initially asked for arbitration of all disputes with the Lawyers, including its tort claims, it is not estopped to assert that these claims were not subject to the arbitration agreement because it did not have knowledge of all its claims at the time it requested arbitration. Tanox, however, recites in detail many of the facts giving rise to its claims for breach of fiduciary duty and legal malpractice in its written demand for arbitration. Therefore, it is evident that Tanox was sufficiently aware of the facts underlying its breach of fiduciary duty and other tort claims at the time it demanded arbitration.

Finally, Tanox argues that as a matter of public policy, a client's breach of fiduciary duty and legal malpractice claims should never be the subject of arbitration, absent special protection. Tanox, therefore, asks this court to declare the arbitration agreement void as a matter of public policy. The San Antonio Court of Appeals rejected this argument, explaining that such "public-policy contentions are unfounded because well established caselaw favors mandatory arbitration and holds that arbitration does not deny parties their right to a jury trial, as a matter of law."

*See Henry v. Gonzalez*, 18 S.W.3d 684, 691 (Tex.App.-San Antonio 2000, pet. dism'd by agr.).[20] Moreover, the fee agreement negotiations were at arm's-length as Tanox had the benefit of representation by independent and experienced legal counsel. Tanox's tort claims were properly submitted to arbitration. This issue is overruled.

## VIII. SUMMARY JUDGMENT FOR INDIVIDUAL DEFENDANTS

Tanox claims the trial court erred in granting summary judgment in favor of the Individual Lawyers on the affirmative defenses of res judicata and collateral estoppel. For the reasons set forth in the concurring opinion on rehearing, this issue is overruled by a majority of the panel.

## IX. CONCLUSION

We conclude the trial court did not err in granting the Lawyers' motion to confirm the arbitration award and in denying Tanox's motion to vacate the arbitration award. Accordingly, the judgment of the trial court is affirmed.

WANDA McKEE FOWLER, J., Concurring on Rehearing on Part VIII, joined by EDELMAN, J.

J. HARVEY HUDSON, J. Dissenting on Rehearing of Part VIII of Opinion on Rehearing.

WANDA McKEE FOWLER, Justice, concurring.

We fully concur in the court's judgment and join the Majority Opinion in its disposition of all issues except this one. This is the opinion of the court as to this issue.

---

**20.** *But see id.* at 693 (Hardberger, C.J., dissenting) (expressing concerns that applying general contractual principles to arbitration agreement in context of attorney-client relationship ignores reality that attorney and client are not in most instances engaged in arm's-length transaction during initial negotiations).

## I. SUMMARY JUDGMENT FOR INDIVIDUAL LAWYERS

 Tanox claims the trial court erred in granting summary judgment in favor of the Individual Lawyers on the affirmative defenses of res judicata and collateral estoppel.[1] To prevail on a motion for summary judgment, the defendant must establish that no material fact issue exists and it is entitled to judgment as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222 (Tex.1999). If the defendant moves for summary judgment on an affirmative defense, it has the burden to prove conclusively all the elements of the affirmative defense. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 530 (Tex.1997).

Res judicata, or claims preclusion, precludes the relitigation of claims that have been finally adjudicated, as well as related matters that should have been litigated in the prior suit. *State & County Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex.2001). Texas follows the transactional approach. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 631 (Tex.1992). Under that approach, a subsequent suit is barred if it arises out of the same subject matter of the prior suit and which through diligence could have been litigated in the prior suit. *Id.* The elements of res judicata are: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996).

Collateral estoppel prevents a party from relitigating an issue that it previously litigated and lost. *Quinney Elec., Inc. v. Kondos Entertainment, Inc.*, 988 S.W.2d 212, 213 (Tex.1999) (per curiam). It generally applies when the issue was fully and fairly litigated in the previous action and was essential to the judgment in the previous action. *Id.* The elements of collateral estoppel are: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990). The issue decided in the prior action must be identical to the issue in the pending action. *State & County Mut. Fire Ins. Co.*, 52 S.W.3d at 696. Collateral estoppel further requires a final judgment. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 595 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Starnes v. Holloway*, 779 S.W.2d 86, 93 (Tex.App.-Dallas 1989, writ denied).

Tanox contends res judicata and collateral estoppel are inapplicable because there was no final judgment. On motion for rehearing, the Individual Lawyers urge us to reconsider our initial conclusion that res judicata and collateral estoppel did not apply to the summary judgment hearing. They argue that the arbitration award in favor of the law firms does have a preclusive effect as to them because it has the same effect as a judgment of a court of last resort.

As we noted in our original opinion on February 16, 2000, the trial court entered an amended interlocutory judgment granting the motion and application to confirm the arbitration award, denying the motion to vacate the award, and ordering that Tanox take nothing on its claims against

---

1. As noted in the majority opinion (see footnote 1 *supra*), the Individual Lawyers are Michael J. Madigan, Michael J. Mueller, Kenneth M. Robinson, and Gerald M. Birnberg.

the law firms. On March 28, 2000, the trial court granted summary judgment in favor of the Individual Lawyers and entered a final judgment.

■ While we acknowledge that it is a close issue, we believe the weight of authority suggests that an arbitration award has preclusive effect even though an appeal of the award is pending. As discussed below, courts have concluded this because an arbitration award has the same effect as a final judgment; in fact, courts have held that an arbitration award can have preclusive effect, even though it is not confirmed and a judgment is not entered.

In *Scurlock Oil Co. v. Smithwick,* the Texas Supreme Court held that, with an exception not applicable here, a trial court's judgment is final for purposes of res judicata and collateral estoppel despite a pending appeal. *See* 724 S.W.2d 1, 6 (Tex.1986).[2] In addition, our courts have recognized that an arbitration award has the same effect as the judgment of a court of last resort. *Anzilotti v. Gene D. Liggin, Inc.,* 899 S.W.2d 264, 266 (Tex.App.-Houston [14th Dist.] 1995, no writ); *J.J. Gregory Gourmet Services, Inc. v. Antone's Import Co.,* 927 S.W.2d 31 (Tex. App.-Houston [1st Dist.] 1995, writ denied); *City of Baytown v. C.L. Winter, Inc.,* 886 S.W.2d 515, 518 (Tex.App.Houston [1st Dist.] 1994, writ denied); *Albert v. Albert,* (Tex.Civ.App.-San Antonio 1965, 391 S.W.2d 186, writ ref'd n.r.e.); *see also* RESTATEMENT (SECOND) OF JUDGMENTS, § 84 (an arbitration award "has the same effects under the rules of res judicata as a judgment of a court"). If an arbitration award is the equivalent of a judgment of a court, then, based on *Scurlock,* an arbitration award, like a judgment, should be given preclusive effect even though an appeal is pending.

In our original opinion we recognized the general principle that arbitration awards can have preclusive effect in subsequent litigation. *See, e.g., Milliken v. Grigson,* 986 F.Supp. 426, 431 (S.D.Tex. 1997), *aff'd,* 158 F.3d 583 (5th Cir.1998); *Drago Daic, Tr. v. Nauru Phosphate Royalties (Tex.), Inc.,* 27 S.W.3d 695, 701 (Tex. App.-Beaumont 2000, pet. denied). Moreover, several federal courts have held that confirmation of an arbitration award and the entry of a judgment may not be required to render an award final for purposes of res judicata and collateral estoppel. *See, e.g., Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 267–68 (2d Cir.1997) (holding that res judicata and collateral estoppel apply to issues resolved by arbitration when there has been a final determination on the merits, notwithstanding a lack of confirmation of the award); *see also Pryner v. Tractor Supply Co.,* 109 F.3d 354, 361 (7th Cir.1997) (recognizing that an arbitration award, whether or not confirmed, can be pleaded as res judicata).

■ Here, the trial court confirmed the arbitration award and denied Tanox's motion to vacate. The trial court also granted the Individual Lawyers summary judgment against Tanox based on the preclusive effect of the arbitration award. Tanox appealed. Because the arbitration award was tantamount to a judgment, it did not lose its preclusive effect during appeal.

As for the argument that the arbitration award did not have preclusive effect because the award was not being used in a subsequent proceeding that was separate from the proceeding in which the arbitra-

---

**2.** The Court noted an exception to the rule when "what is called an appeal actually consists of a trial de novo." 724 S.W.2d at 6.

tion occurred, we agree with the argument the Individual Lawyers present in their motion for rehearing: the arbitration proceeding was a "separate proceeding" *unto* itself. Tanox's motion to vacate filed in the trial court was, in essence, an appeal of that final award, and the claims against the Individual Lawyers—heard in conjunction with the motion to vacate and not a part of the arbitration proceedings—were a completely separate proceeding from the arbitration proceeding. So, technically, the award was being applied to a subsequent, separate hearing.[3]

For these reasons, we grant the Individual Lawyers' rehearing on this issue and affirm the summary judgment the trial court entered in their favor.

J. HARVEY HUDSON, Justice, dissenting.

Originally, we sustained Tanox's claims that the trial court erred in granting summary judgment in favor of the Individual Lawyers on the affirmative defenses of res judicata and collateral estoppel. On rehearing, a majority of the panel concludes we erred in so holding. Because I do not agree, I respectfully dissent to the granting of rehearing.

Subsequent to its February 16, 2000 amended *interlocutory* order confirming the arbitration award, the trial court, on March 28, 2000, the trial court granted summary judgment in favor of the Individual Lawyers based on res judicata and

collateral estoppel and entered a *final* judgment.

I agree that an arbitration award that has been confirmed by the trial court ordinarily has a preclusive effect as to parties in subsequent proceedings. The discrete issue in this case is the trial court's interlocutory order confirming the arbitration award and the order granting summary judgment in favor of the Individual Lawyers were in the same trial court proceeding. The majority proposes that the arbitration proceeding and Tanox's motion to vacate, which was in effect an appeal of the final arbitration award, were part of a proceeding separate from the proceeding in which the claims against the Individual Lawyers were heard.

I disagree. The arbitration award, whether confirmed or unconfirmed, was interlocutory. At that point, Tanox could not take an appeal of the award in the absence of the trial court entering a final judgment, which it did so subsequently.[1] Thus, there was no *final* judgment and, therefore, the award had no preclusive effect.

Because there was no final judgment as to the arbitration award, as required for both res judicata and collateral estoppel, I would find the trial court erred in granting summary judgment in favor of the Individual Lawyers on the affirmative defenses of res judicata and collateral estoppel. Ac-

**3.** Although this additional argument is useful in this case to illuminate how separate the arbitration proceeding and the claims against the Individual Lawyers were, if an arbitration award *is final* when entered, this additional separation is probably not necessary because the motion to vacate is itself a separate, subsequent proceeding from the arbitration proceeding.

**1.** A final judgment as to the Lawyers' arbitration award against Tanox could have been

achieved by severing Tanox's claims against the Individual Lawyers. At that point, there would have been a final judgment and summary judgment based on res judicata and collateral estoppel in favor of the Individual Lawyers would have been appropriate. In the absence of a severance, an order from an appellate court remanding the summary judgment to the trial court necessary severs the action from the remainder of the case, thereby creating a final judgment.

272

cordingly, I dissent to the granting of re-hearing.