

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-317-CV

AVERY PHARMACEUTICALS, INC.        APPELLANTS/CROSS-APPELLEES
AND AL SANKARY

V.

HAYNES AND BOONE, L.L.P.,        APPELLEES/CROSS-APPELLANTS
CRAIG PRICE, JOHN BUTLER
EATON, AND BILL NAIFEH

------------

### FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellants and Cross-Appellees Avery Pharmaceuticals, Inc. and Al Sankary (collectively "Appellants") appeal from the trial court's order granting summary judgment in favor of Appellees and Cross-Appellants Haynes and

---

[1] *See* Tex. R. App. P. 47.4.

Boone, L.L.P., Craig Price, John Butler Eaton, and Bill Naifeh (collectively "Appellees").  In seven issues, Appellants argue that the trial court erred by granting Appellees' motion for summary judgment, by overruling Appellants' objections to Appellees' summary judgment evidence, and by denying Appellants' motion for new trial.  In a single cross-issue, Appellees argue that the trial court should have granted Appellees' plea to the jurisdiction.  We will affirm.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

John Ver Vynck, a former employee of Respiratory Druggist, Inc. ("RDI"), an Alabama business, approached Sankary in 2000 with a business plan to develop Avery—a business designed to be a wholesale distributor of generic pharmaceuticals, including respiratory medications and plastic vials.  Ver Vynck and Sankary subsequently entered into a business relationship together, Avery's articles of incorporation were filed in July 2000, and Sankary made an initial capital investment in Avery of approximately $300,000.  Ver Vynck and Sankary each owned 50% of Avery;[2] Ver Vynck, Sankary, and Herman initially

---

[2] Initially, however, according to Ver Vynck, at the time of Avery's formation, Ver Vynck owned 50% of Avery, Sankary owned 24%, Steve Herman (Sankary's nephew) owned 24%, and another individual owned 1%.

2

served as Avery's directors;[3] Ver Vynck was Avery's president; and Sankary was Avery's chief executive officer.

Ver Vynck was the "key man" at Avery due to his pharmaceutical experience, but Sankary played a substantial role in the day-to-day decision making process at Avery, according to Ver Vynck and Mark Acker, a former Avery employee. At any given time, Avery employed between twenty to twenty-two employees. Avery conducted business out of a building in Euless owned by Sankary before moving to a location in Fort Worth in late 2002.

Haynes and Boone represented Avery and Ver Vynck, individually, on a number of different matters. According to Price and Eaton, Haynes and Boone attorneys, Haynes and Boone was not general or corporate counsel for either Ver Vynck or Avery, and Haynes and Boone did not provide day-to-day legal counsel to Ver Vynck or Avery; Ver Vynck and Avery engaged Haynes and Boone on a "project-based basis." For instance, according to Eaton, he "reviewed and revised an independent contractor agreement for Avery on March 30, 2001, and April 1, 2001"; in July 2001, at Ver Vynck's request, he "prepared a shell document for a stock purchase agreement between Ver Vynck and [Sankary] where Ver Vynck would purchase Sankary's Avery stock"; and

---

[3] Herman later sold his shares to Sankary and left the board.

3

in November 2001, at Ver Vynck's request, he "revised the draft stock purchase agreement by removing certain provisions and forwarded it to Ver Vynck."[4]

In December 2001, at Ver Vynck's request, Eaton prepared a promissory note and security agreement between Avery and Sankary regarding a loan by Sankary to Avery. Pursuant to the note, Avery promised to pay Sankary $393,039.00. The security agreement gave Sankary a security interest in various types of Avery collateral.

At some point after Avery's formation, RDI initiated litigation in Alabama against Ver Vynck, Acker, and Tim Fickling (a former Avery employee) complaining of alleged violations of noncompete agreements with RDI. Yancey Burnett represented Ver Vynck in the Alabama litigation, but according to Appellees, Haynes and Boone also provided advice to Ver Vynck and Avery about the matter until January 2, 2001.[5] Following a trial, the Alabama circuit judge signed an "Order Granting Relief Pursuant to Breach of Employment

---

[4] According to Eaton, "Neither of these draft agreements contained any sales price terms."

[5] A January 2, 2001 letter addressed to Ver Vynck from Price concerns "Respiratory Druggist, Inc., Respiratory Distribuitors, Inc./Richard Powell" and states that "[i]t is my understanding that, at this time, we are not addressing any outstanding legal issues for Avery Pharmaceuticals."

4

Agreements" on February 20, 2002, that enjoined Ver Vynck from certain conduct—including competing with RDI—for eighteen months.[6]

After entry of the Alabama injunction, Ver Vynck sought advice from Haynes and Boone regarding his compliance with the enjoining order and the order's effect on Avery. In an effort to comply with the order, Ver Vynck sold his shares in Avery to Fickling effective March 19, 2002. Eaton prepared "shell document[s]" for a Stock Purchase Agreement and an Option Agreement (in which Fickling granted Ver Vynck the option to purchase back the Avery shares at a later date)[7] for Ver Vynck and Fickling to carry out the transaction.[8]

---

[6] The order specifically enjoined Ver Vynck "from directly or indirectly soliciting . . . or accepting . . . any business from any of RDI's former customers which involves respiratory medications or unit dose vials utilized in the sale of respiratory medications"; "from hiring away or attempting to hire away . . . any RDI employee"; "from directly or indirectly engaging in any business dealing in any way with the home health care field as it relates to the purchase or sale of respiratory medication and unit dose vials; "from operating as a sole proprietor, or owning any interest in any person, firm, corporation, partnership, or other entity engaged in the business of purchasing or selling respiratory medications and unit dose vials and related equipment"; and "from directly or indirectly owning any interest in, or becoming employed in, any entity engaged in the business of the same or similar nature as [RDI]."

[7] According to Eaton, he "did not negotiate any of the terms of either agreement," and he "was unaware whether the agreements were ever executed or consummated."

[8] The summary judgment evidence is unclear regarding all of the details surrounding the effect, if any, of the agreements. Fickling testified in his deposition that he "signed back" the Avery stocks to Ver Vynck at some point, but he also agreed that he "didn't end up owning anything" after signing the

5

It was also (somehow) determined that Ver Vynck could sell veterinarian products (not respiratory drugs) to veterinarian clinics and wholesalers yet still comply with the Alabama order enjoining him from competing with RDI. To this end, Haynes and Boone formed Avery Wholesale Pharmaceuticals, Inc. ("AWP").[9] Ver Vynck was AWP's sole shareholder and director. AWP was not a subsidiary or division of Avery.

Another business that Haynes and Boone formed at Ver Vynck's request was Infinity Custom Plastics, Inc. ("Infinity"). Avery purchased plastic vials (about two million per month) from a Florida company and used the vials to package medication. According to Ver Vynck, he and Sankary decided that they should develop their own medication vial product. Consequently, they conceived Infinity "to purchase these containers from the manufacturer and sell them back to Avery." Ver Vynck was Infinity's sole shareholder and director. Sankary, however, chose to be a capital investor in Infinity, not a shareholder,

---

agreements. Whatever the case, Eaton prepared the documents.

[9] Sankary opined that AWP was formed behind his back and to circumvent the Alabama order and that Appellees did not inform him or reveal that they were forming AWP; had they done so, he would have objected. Ver Vynck and Acker, however, opined that Sankary was aware of AWP and the nature of its business.

according to Ver Vynck.[10] Letson opined that he was the individual responsible for developing the vial to implement the Avery/Infinity plan and that he developed such a vial.

In August 2002, Letson and Ver Vynck, on behalf of Infinity, met with Naifeh, another Haynes and Boone attorney, to consult regarding the application for a patent of the newly developed vial and process for filling and sealing the vial.[11] According to Naifeh, "It was confirmed at the meeting that [Infinity] would own all patents related to the vial and the process." Haynes and Boone filed a provisional patent application for the vial on or about November 20, 2002, and the vial technology was assigned to Infinity. At Ver Vynck's request, Haynes and Boone also prepared a Contract Supply Agreement ("CSA") between Avery and Infinity effective January 1, 2003, in which Infinity agreed to sell and Avery agreed to purchase vials.[12]

---

[10] Sankary said he had no idea that Infinity was being formed when it happened and that Appellees did not inform him or reveal that they were forming Infinity. Had they done so, he would have objected. But Nick Letson, an Avery salesman, reasoned that Sankary worked independently on a "vial tray," and Ver Vynck opined that Sankary was involved in efforts to obtain financing for leasing vial-sealing equipment to Infinity.

[11] The vial was designed to be sealed using an ultrasonic sealer instead of a heat sealer. Naifeh said that Bernard Strong, a "California plastics inventor, came up with the specific features of the vial."

[12] Ver Vynck opined that Sankary was fully aware of the CSA, but Sankary claimed at his February 2005 deposition that he did not learn about it

7

In March 2003, Ver Vynck and Sankary signed a letter addressed to Standard Management Corporation ("Standard") detailing the terms by which Avery would sell its stock to Standard.[13] But a sale of Avery to Standard never happened.

Ultimately, the Avery vial was never manufactured in commercially feasible numbers, Infinity never sold any vials—including to Avery, Avery never paid any money to Infinity, and Infinity never sold any products. The United States Patent and Trademark Office also rejected the patent application for the Avery vial.

In April 2003, Sankary sued Ver Vynck and Avery to recover money owed under the promissory note that Avery executed in favor of Sankary in December 2001.[14] In May 2003, Sankary, Ver Vynck, and the other defendants reached a settlement agreement. The settlement agreement provided in part that the parties "agree to the sale of the assets of Avery, [Infinity], and [AWP] to Drugmax, Inc. . . . on the terms set forth in the Asset

until recently.

[13] According to Sankary, however, Haynes and Boone did not have the authority to open a file for the sale of Avery to Standard.

[14] Sankary also sued A&R Pharmacy, a/k/a Airway Relief Pharmacy, Inc., ("A&R") to recover money owed under a promissory note that A&R executed in favor of Sankary in December 2001. A&R is yet another Ver Vynck pharmaceutical business that Sankary invested in.

Purchase Agreement ("APA")." Consistent with this term, Avery, AWP, and Infinity sold all of their assets to Discount Rx, Inc. pursuant to the APA on May 14, 2003.[15] Sankary remains Avery's sole director and shareholder, and he claims to hold shrareholder's and director's meetings, but Avery has no employees, no business location, and no assets.

Appellants sued Appellees in March 2004. Appellants' seventh amended original petition asserted claims against Appellees for legal malpractice, breach of fiduciary duty, fraud, negligent misrepresentation, and conspiracy to defraud.[16] Appellees moved for summary judgment on Appellants' claims on no evidence and traditional grounds and filed a plea to the jurisdiction

---

[15] Sankary also obtained a temporary restraining order when he sued Ver Vynck and Avery in April 2003 that enjoined Ver Vynck and the other defendants from "taking actions that will diminish . . . Sankary's security interests." Ver Vynck reasoned that Sankary forced him to agree to the sale of Avery's, Infinity's, and AWP's assets by way of the temporary restraining order because Ver Vynck could not "have an income, provide for my family. I was basically kicked out of the company."

[16] Appellants alleged in part that Appellees failed to dissuade Ver Vynck from breaching duties owed to Avery; charged or accepted payments from Avery for legal work performed for or to benefit others; disclosed confidential or privileged information to Ver Vynck at a time when he was enjoined from owning or operating Avery; failed to render full and fair disclosure of facts material to Appellants' representation; failed to adequately perform a conflicts check; and represented Appellants and Ver Vynck, AWP, and Infinity at a time when such representation involved substantially related matters in which Ver Vynck's interests were materially and directly adverse to the interests of Appellants.

9

challenging Appellants' standing. The trial court signed an order granting summary judgment to Appellees on June 18, 2007; the trial court did not rule on Appellees' plea to the jurisdiction.[17]

### III. SUMMARY JUDGMENT

Appellants argue in their first, second, third, fourth, and fifth issues that the trial court erred by granting Appellees' motion for summary judgment. In their sixth issue, Appellants argue that the trial court erred by denying their objections to part of Appellees' summary judgment evidence.

**A.      Standard of Review**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P.

---

[17] The trial court originally signed an order granting Appellees' motion for summary judgment on August 21, 2006. Thereafter, a visiting judge granted Appellants' motion for new trial, and Appellees filed their second traditional and no-evidence motions for summary judgment in April 2007.

10

166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins.*

*Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).[18]

### B. Sankary's Legal Malpractice and Breach of Fiduciary Duty Claims

#### 1. Malpractice

In their third issue, Appellants challenge the trial court's grant of summary judgment in favor of Appellees on the ground that Sankary was not a client of Appellees. Appellees claimed in their no-evidence motion for summary judgment that there is no evidence Sankary was ever their client and that they never owed Sankary any duty.

Legal malpractice is a tort cause of action based on negligence. *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 783 (Tex. 2006). To prevail on a legal malpractice claim, a plaintiff must show that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.

---

[18] Appellees also filed a traditional motion for summary judgment on Appellants' claims. But when a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). If the appellants failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.* Because we affirm the trial court's grant of summary judgment on no-evidence grounds, we do not set forth and utilize the traditional motion for summary judgment standard of review.

*Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004); *Grider v. Mike O'Brien, P.C.*, 260 S.W.3d 49, 55 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). At common law, the rule of privity limits an attorney's liability to those in privity with the attorney. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999). An attorney in Texas is therefore not liable for malpractice to anyone other than his client. *Id.*; *see also Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996); *Stancu v. Stalcup*, 127 S.W.3d 429, 432 (Tex. App.—Dallas 2004, no pet.); *Gamboa v. Shaw*, 956 S.W.2d 662, 664 (Tex. App.—San Antonio 1997, no writ); *Stonewall Surplus Lines Ins. Co. v. Drabek*, 835 S.W.2d 708, 710 (Tex. App.—Corpus Christi 1992, writ denied) ("It is well settled that persons outside the attorney-client relationship do not have a cause of action for injuries they might sustain due to the attorney's failure to perform or his negligent performance of a duty owed to his client.").

The attorney-client relationship is a contractual relationship whereby an attorney agrees to render professional services for a client. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The relationship can be created by an express contract or it can be implied from the actions of the parties. *Id.*; *Honeycutt v. Billingsley*, 992 S.W.2d 570, 581 (Tex. App.—Houston [1st Dist.]

13

1999, pet. denied).[19] In determining whether a contractual relationship can be implied, we use an objective standard, looking at what the parties said and did, and we do not consider their unstated, subjective beliefs. *Tanox, Inc.*, 105 S.W.3d at 254; *Roberts v. Healey*, 991 S.W.2d 873, 880 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Difficulties in determining the existence of an attorney-client relationship can often occur when a lawyer represents a small entity with "extensive common ownership and management." *MacFarlane v. Nelson*, No. 03-04-00488-CV, 2005 WL 2240949, at *4 (Tex. App.—Austin Sept. 15, 2005, pet. denied) (mem. op.) (citing Restatement (Third) of the Law Governing Lawyers § 14 cmt. f (2000)). Generally, however, rendering legal services to a corporation does not, by itself, create privity between the attorney and the corporation's investors, its officers and directors, and its shareholders. *Goeth v. Craig, Terrill & Hale, L.L.P.*, No. 03-03-00125-CV, 2005 WL 850349, at *6 (Tex. App.—Austin Apr. 14, 2005, no pet.) (mem. op.); *see also Gamboa*, 956 S.W.2d at 664 (holding that purported shareholder was not in privity with

---

[19] For instance, the relationship can be implied from the parties' conduct indicating the intent to enter into such a relationship, or it can be implied from the attorney's gratuitous rendition of professional services. *Sotelo v. Stewart*, No. 08-06-00145-CV, 2008 WL 2174425, at *3 (Tex. App.—El Paso May 22, 2008, pet. filed).

attorney who represented corporation and thus could not maintain legal malpractice claim based on attorney's representation of corporation).  This is because a corporation is a legal entity separate and apart from the persons who compose it, and a cause of action against one who has injured the corporation belongs to the corporation and not to the shareholders.  *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.—Dallas 2007, no pet.); *Hajdik v. Wingate*, 753 S.W.2d 199, 201 (Tex. App.—Houston [1st Dist.] 1988), *aff'd*, 795 S.W.2d 717 (Tex. 1990).

In the present case, Sankary argues that the evidence is such that he "could have reasonably concluded that [Appellees] represented his interests along with those of Avery."  Relying on deposition testimony and affidavits, he thus contends that an attorney-client relationship between he and Appellees could be implied from the parties' conduct.  *See Tanox, Inc.*, 105 S.W.3d at 254.

Sankary testified in his deposition that Haynes and Boone represented him in connection with the preparation of the December 31, 2001 promissory note made payable to him by Avery.  He testified as follows:

> [Appellees' attorney]: You were represented by Haynes and Boone in connection with your securing a note from Avery Pharmaceutical, correct?

15

[Sankary]: Evidently, yeah. They drew it up. And evidently if they worked for the - - if they worked for Avery, they were working for me.

Sankary similarly opined that Haynes and Boone represented him in connection with the preparation of the December 31, 2001 security agreement that gave him a security interest in Avery collateral. But Sankary's subjective belief that Haynes and Boone represented him simply because it drafted the note and security agreement on behalf of Avery is insufficient to raise a fact issue that Haynes and Boone also owed him any duty of care because Haynes and Boone's representation of Avery (the rendering of legal services to a corporation) did not, by itself, create privity with Sankary. *See Goeth*, 2005 WL 850349, at *6; *see also Tanox, Inc.*, 105 S.W.3d at 254; *Gamboa*, 956 S.W.2d at 664. Sankary points to no other evidence objectively demonstrating that Haynes and Boone represented him individually with regard to the preparation of the Avery promissory note and security agreement.

Sankary further opined that Haynes and Boone represented him in connection with its preparation of a promissory note made payable to him by A&R and a security agreement with A&R. He also stated in his affidavit that Haynes and Boone "represented [Avery] and the officers, directors[,] and shareholders of [Avery] beginning in 2001" and that "[a]lthough I may have had more than one attorney at times, I still considered [Haynes and Boon] to

16

represent the interests of [Avery] and myself from 2001 into 2003." But Sankary directs us to no summary judgment evidence objectively demonstrating that Haynes and Boone represented him individually in regard to the A&R note and security agreement, nor does he point to evidence supporting the contentions set forth in his affidavit, which conflict with well-established caselaw. *See Walker*, 232 S.W.3d at 918; *Tanox, Inc.*, 105 S.W.3d at 254; *Goeth*, 2005 WL 850349, at *6.

Sankary also included in his summary judgment evidence the affidavit of James McCormick. In the affidavit, McCormick detailed the "facts and issues" that he considered in arriving at his opinions, and he opined that Sankary had an attorney-client relationship with Appellees. With a few exceptions, the "facts and issues" relied upon by McCormick in arriving at his opinion consist of many of the same facts detailed in the "Background" section above. These facts, and those relied upon by McCormick, do not demonstrate that Appellees had an attorney-client relationship with Sankary. They instead show the existence of an attorney-client relationship with Ver Vynck, Avery, or both.[20]

---

[20] One of our sister courts listed in a memorandum opinion several factors to consider in determining whether an entity lawyer also represents an individual associated with the entity. Those factors include the following: whether the lawyer affirmatively assumed the duty of individual representation, whether the individual had independent representation, whether the lawyer previously represented the individual on a personal basis, and whether the

17

Examining the entire record in the light most favorable to Sankary and indulging every reasonable inference and resolving any doubts against the motion, Sankary failed to produce summary judgment evidence raising a genuine issue of material fact that Appellees owed him a duty of care as a result of an attorney-client relationship. *See* Tex. R. Civ. P. 166a(i); *F.E. Appling Interests*, 991 S.W.2d at 792 (holding that privity limits an attorney's liability to those in privity with the attorney); *see also Estate of Bradburn v. Sawko*, No. 02-02-00192-CV, 2003 WL 21359514, at *3 (Tex. App.—Fort Worth June 12, 2003, no pet.) (mem. op.) (affirming grant of no-evidence motion for summary judgment on legal malpractice claim). Accordingly, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Sankary's legal malpractice claim. We overrule Appellants' third issue.

### 2. Breach of Fiduciary Duty

In part of their fifth issue, Appellants challenge the trial court's grant of summary judgment in favor of Appellees on the breach of fiduciary duty claims.

---

evidence demonstrates the individual's reliance on or expectations of the lawyer's separate representation. *See MacFarlane*, 2005 WL 2240949, at *4. To the extent these factors are applicable to the analysis of whether an attorney-client relationship existed between Sankary and Appellees, each of the factors weighs in favor of a determination that no attorney-client relationship existed.

To recover on a breach of fiduciary duty claim, a plaintiff must first show that the defendant owed a fiduciary duty. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (listing elements of breach of fiduciary duty claim as existence of fiduciary duty, breach of the duty, causation, and damages). Fiduciary duties arise when an attorney-client relationship is created. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005); *Trousdale v. Henry*, 261 S.W.3d 221, 229 (Tex. App.—Houston [14th Dist.] 2008, pet. filed) (stating that in Texas, a fiduciary relationship exists between attorney and clients as a matter of law).

Having determined that Sankary failed to produce summary judgment evidence demonstrating the existence of an attorney-client relationship between he and Appellees, Appellees therefore owed Sankary no fiduciary duties. There being no evidence of the existence of a fiduciary duty owed to Sankary by Appellees, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Sankary's breach of fiduciary duty claim. *See* Tex. R. Civ. P. 166a(i); *Swank v. Cunningham*, 258 S.W.3d 647, 666 (Tex. App.—Eastland 2008, pet. denied) ("An attorney-client relationship did not exist between Beck Redden or Smyser Kaplan and AMPS. In the absence of an attorney-client relationship, Beck Redden and Smyser Kaplan did not owe

fiduciary duties to AMPS, and AMPS could not recover on a breach of fiduciary duty claim against them."). We overrule this part of Appellants' fifth issue.

### C. Avery's Legal Malpractice and Breach of Fiduciary Duty Claims

#### 1. Malpractice

In another part of their fifth issue, Appellants argue that the trial court erred by granting summary judgment in favor of Appellees on the legal malpractice claims. Appellees contended in their no-evidence motion for summary judgment that Avery did not suffer any damages.

While uncertainty as to the amount of damages is not fatal to recovery, lack of evidence or uncertainty as to the fact of damages is. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985); *Pace Corp. v. Jackson*, 155 Tex. 179, 190, 284 S.W.2d 340, 348 (1955). Damages must be ascertainable in some manner other than by mere speculation or conjecture and by reference to some fairly definite standard, established experience, or direct inference from known facts. *A.B.F. Freight Sys., Inc. v. Austrian Import Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). If damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997); *Swank*, 258 S.W.3d at 667.

The two components of proximate cause are cause in fact and foreseeability. *Rodgers v. Weatherspoon*, 141 S.W.3d 342, 345 (Tex. App.—Dallas 2004, no pet.). Cause in fact means that the defendant's acts or omissions were a substantial factor in bringing about the injury that would not otherwise have occurred, and foreseeability of harm means that the actor could anticipate that his actions could injure another. *Id*.

Appellants included in their summary judgment evidence a July 2003 report that Letson prepared detailing Avery's projected and "Estimated Sales" of the vial that Letson developed had Avery ultimately sold the vial. Letson reasoned in the report that "Avery concluded that an estimated 18,000,000 vials could be sold direct to end users within one month" and that "Avery anticipated end user sales to exceed $900,000 per month." Considering these figures and the three-year CSA that Infinity had with Avery, Letson testified in his deposition that Avery suffered approximately $22.5 million in lost profits damages.

Letson's opinion that Avery suffered $22.5 million in lost profits damages is laced with and reliant upon speculation and conjecture. In arriving at the $22.5 million figure, Letson reasoned that the vials would be manufactured and labeled at Infinity, that Avery would distribute the products, and that "large national accounts would buy directly from Infinity." Letson identified five

21

businesses (accounts) that he thought would purchase products directly from Infinity, but he acknowledged that only one was actually a customer of Avery. Two other accounts "wanted a demonstration of the equipment before commitment," and there was no evidence that the two remaining accounts were Avery customers and no evidence that the four non-Avery customers intended at any point to enter into a business relationship with Infinity or Avery for the purpose of purchasing vials.

The vial project also suffered from a lack of capital. Letson testified that the new vial was never manufactured in commercially feasible numbers. According to Letson, Avery had "one small capacity mold that would work. We produced samples. We sealed vials. We did demonstrations." However, "[w]ith the mold capacity that [Avery] had, we could not supply our existing customers" because the company lacked the capital to fund the project.

Significantly, all of Avery's assets were sold to Discount Rx pursuant to the APA on May 14, 2003. Letson testified that his damages model is dependent on the sale of Avery's assets to Discount Rx *not* happening, and he agreed that it was the shareholders' decision to sell the assets.

Moreover, according to Appellants' summary judgment evidence, Discount Rx's sales figures for the vial that it eventually began to sell after purchasing Avery are considerably less than Letson's projection that Avery

22

would have sold approximately fifteen to eighteen million vials to end users per month. Letson testified that it took Discount Rx two years to get the vial to the market after the purchase of Avery and that according to "market knowledge," Discount Rx has had monthly sales in the amount of "half a million to three quarters of a million vials a month."

Letson's $22.5 million damages figure is based on lost profits from the sale of the vial that he worked to develop while employed by Avery. Letson and Ver Vynck met with Naifeh in 2002 to consult regarding the application for a patent of the vial. Appellants have offered no evidence that the patent application for the new vial was ever approved.[21] Avery's damages figure is speculative in the absence of an approved patent for the new vial.

Appellants contend that Avery suffered damages from Appellees' formation of AWP and Infinity. Appellants argue that Appellees caused the formation of AWP to evade the RDI injunction and to defraud Appellants and that a conflict of interest arose when Appellees formed AWP. Regarding Infinity, Appellants complain that Appellees performed no conflict checks.

---

[21] Indeed, Appellees supplemented their motions for summary judgment with evidence that the patent had been rejected by the United States Patent and Trademark Office.

23

There is no summary judgment evidence that Avery was damaged as a result of the formation of AWP and Infinity.

Appellants argue that Avery suffered damages from Appellees' preparation of the Fickling Stock Purchase Agreement and Option Agreement. They contend that Fickling was a "straw man" and that he was never in charge of Avery, but there is no evidence that Avery was damaged as a result of Appellees' preparation of the Fickling documents.

Appellants contend that Avery suffered damages as a result of Appellees' preparation of the CSA between Avery and Infinity. Sankary agreed in his deposition, however, that not a single product was sold under the CSA nor had Avery ever paid a single dime to Infinity. Consequently, there is no evidence that Avery was damaged as a result of Appellees' preparation of the CSA.

Appellants argue that Avery suffered damages as a result of Appellees' preparation of the vial assignment documents and the provisional patent application. As detailed above, however, Appellants produced no evidence that the application for the patent has been approved, and Appellants' evidence of Letson's opinion regarding lost profits damages is speculative.

Appellants further argue that Avery suffered damages as a result of Appellees' fraudulent or negligent negotiations with Standard. They contend that Appellees did not timely communicate an offer by Standard to purchase

24

Avery, and they submitted an email from Price in which Price indicated a desire to set up a conference call between Avery, Sankary, and their counsel to discuss the sale. This email alone, however, is no evidence that Appellees' alleged untimely communication of the Standard offer caused Standard not to purchase Avery, nor does the extent of Appellants' summary judgment evidence indicate as much either.

Avery's evidence of damages is simply too remote, too uncertain, or purely conjectural, such that the damages cannot be recovered as a matter of law. *See Arthur Andersen & Co.*, 945 S.W.2d at 816. Examining the entire record in the light most favorable to Avery and indulging every reasonable inference and resolving any doubts against Appellees' motion for summary judgment, we hold that Avery failed to produce summary judgment evidence raising a genuine issue of material fact that it suffered damages resulting from Appellees' complained-of conduct or that Appellees' complained-of conduct proximately caused Avery damages. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of Appellants' fifth issue.

### 2. Breach of Fiduciary Duty

In another part of their fifth issue, Appellants challenge the trial court's grant of summary judgment in favor Appellees on Avery's breach of fiduciary duty claim.

25

The essence of a claim for breach of fiduciary duty focuses on whether an attorney obtained an improper benefit from representing the client. *McGuire, Craddock, Strother & Hale, P.C., v. Transcontinental Realty Investors, Inc.*, 251 S.W.3d 890, 894 (Tex. App.—Dallas 2008, pet. denied); *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 923 (Tex. App.—Fort Worth 2002, pet. denied) (stating that the focus of a breach of fiduciary duty is whether an attorney obtained an improper benefit from representing a client and that the essence of a breach of fiduciary duty involves the integrity and fidelity of an attorney). An attorney breaches his fiduciary duty to a client when he, among other things, subordinates his client's interests to his own, engages in self dealing, fails to disclose conflicts of interest, or makes misrepresentations to achieve these ends. *Transcontinental Realty Investors, Inc.*, 251 S.W.3d at 894. Fee forfeiture is appropriate only where there is a breach of a duty and a clear and serious violation of a duty to a client that destroys or severely impairs the attorney-client relationship. *Bilodeau v. Webb*, 170 S.W.3d 904, 916 (Tex. App.—Corpus Christi 2005, pet. denied).

Avery generally directs us to Sankary's affidavit, McCormick's affidavit, and Letson's affidavit as evidence that Appellees breached one or more fiduciary duties owed to Avery. It lists numerous acts or omissions allegedly constituting one or more breaches of fiduciary duty, including that Appellees

26

breached their fiduciary duties to Avery "in being disloyal," "in violating firm policies designed to prevent the type of conflicts, injuries, and damages complained of," "in favoring one client over the other," "in continuing to work against the interests of Avery and Sankary, even after [Appellees] anticipated that they would be sued by Avery and/or Sankary," and "in violating and/or failing to comply with numerous provisions of the Texas Disciplinary Rules of Professional Conduct." None of Appellants' evidence, however, demonstrates that—by way of the complained of acts or omissions—Appellees obtained any type of improper benefit. There is no evidence to indicate that Appellees subordinated Avery's interests to their own, engaged in self dealing, failed to disclose conflicts of interest, or made misrepresentations to achieve this end. *See Transcontinental Realty Investors, Inc.*, 251 S.W.3d at 894. Avery's laundry list of alleged breaches of fiduciary duty instead compromises legal malpractice complaints that Sankary has of Appellees. And a fee forfeiture is not appropriate under these circumstances. Because Appellants failed to raise a genuine issue of material fact to show that Appellees breached a fiduciary duty to Avery, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Avery's breach of fiduciary duty claim. *See* Tex. R. Civ. P. 166a(i). We overrule this part of Appellants' fifth issue.

**D. Avery's and Sankary's Remaining Claims**

27

In another part of their fifth issue, Appellants argue that the trial court erred by granting summary judgment in favor of Appellees on the fraud, fraud by nondisclosure, conspiracy to defraud, and negligent misrepresentation claims.

### 1. Fraud, Fraud by Nondisclosure, and Conspiracy to Defraud

The elements of common law fraud are that (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998).

Fraud by nondisclosure is a subcategory of fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). The elements of fraud by nondisclosure require (1) a deliberate failure to disclose material facts, (2) by one who had a duty to disclose such facts, (3) to another who was ignorant of the facts and did not have an equal opportunity to discover them, (4) with the intent the listener act or refrain from acting, and (5) the listener relies on the nondisclosure resulting in injury. *7979 Airport Garage, L.L.C. v. Dollar Rent A*

28

*Car Sys., Inc.*, 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001).

The elements of a conspiracy-to-defraud claim are (1) a combination by two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Hinojosa v. Ashcraft Law Firm*, No. 11-03-00145-CV, 2004 WL 1960217, at *3 (Tex. App.—Eastland Sept. 2, 2004, pet. denied) (mem. op.); *see also Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1969) (including requirements that persons undertake an intentional, concerted action to defraud). Civil conspiracy is a derivative tort; that is, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Recovery is not based on the conspiracy; it is based on an underlying tort. *Lesikar v. Rappeport*, 33 S.W.3d 282, 301–02 (Tex. App.—Texarkana 2000, pet. denied).

Appellants point to the following statements in their brief as evidence of Appellees' alleged fraud, fraud by nondisclosure, and conspiracy to defraud:

29

•failing to make a full disclosure to Appellants of material facts affecting Appellees' representation;

•suppressing facts;

•failing to provide informed disclosure;

•failing to obtain informed consent;

•continuing to represent Ver Vynck, AWP, and Infinity with interests adverse to Appellants;

•failing to inform Appellants that Ver Vynck owned a part of or all of Avery and any business that competed with RDI;

•hiding the RDI injunction from Appellents;

•creating AWP and Infinity for Ver Vynck to compete with Avery;

•failing to take steps to prevent third party Ver Vynck from accessing Avery's funds or property in evading the RDI injunction;

•attempting to cover up Appellees' misconduct;

•failing to keep Appellants adequately informed regarding negotiations with attempted purchase by Standard, including preventing the sale to Standard and making misrepresentations to Standard;

•delaying in the disclosure of information which prevented the sale of Avery to Standard;

•concealing or otherwise impairing the "verity," legibility, or availability of the RDI injunction, the Stock Purchase Agreement and an Option Agreement with Fickling, corporate documents for Infinity and AWP, the CSA, the assignment of the Avery vial patent, and the acquisition of documents for Standard's potential purchase of Avery; and

30

•not disclosing the existence, nature, implications, and possible adverse consequences of the Fickling Stock Purchase Agreement and Option Agreement, the formation and significance of AWP and Infinity, the CSA, and the ongoing representation of Ver Vynck and Ver Vynck's interests contrary to Appellants' interests.

Considering the above statements and the extent of Appellants' summary judgment evidence, there is no evidence raising a genuine issue of material fact that Appellees made to Appellants a material, false representation that was known to be false or that was made recklessly and without any knowledge of the truth. *See Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 524. Because Appellants failed to raise a genuine issue of material fact on one or more challenged fraud elements, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Appellants' fraud claims. *See* Tex. R. Civ. P. 166a(i). We overrule this part of Appellants' fifth issue.

Appellants direct us to evidence apparently demonstrating that Appellees failed to disclose various facts, but there is no summary judgment evidence that Appellees *deliberately* failed to disclose the material facts with the *intent* that Appellants act or refrain from acting based on the nondisclosed information. *See 7979 Airport Garage, L.L.C.*, 245 S.W.3d at 507 n.27. Because Appellants failed to raise a genuine issue of material fact on one or more challenged fraud by nondisclosure elements, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Appellants' fraud

31

by nondisclosure claims.  *See*  Tex. R. Civ. P. 166a(i).  We overrule this part of Appellants' fifth issue.

Because there is no genuine issue of material fact on Appellants' tort claims, there is no genuine issue of material fact supporting Appellants' derivative conspiracy to defraud claim.  *See Tilton*, 925 S.W.2d at 681; *Lesikar*, 33 S.W.3d at 301–02.[22]  Because Appellants failed to raise a genuine issue of material fact on one or more challenged conspiracy to defraud elements, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Appellants' conspiracy to defraud claims.  *See* Tex. R. Civ. P. 166a(i).  We overrule this part of Appellants' fifth issue.

### 2.    Negligent Misrepresentation

An attorney can be subject to a negligent misrepresentation claim in a case in which he is not subject to a legal malpractice claim.  *F.E. Appling Interests*, 991 S.W.2d at 792.  Under the tort of negligent misrepresentation, liability is not based on the breach of duty a professional owes his or her clients or others in privity, but on an independent duty owed to the nonclient based on the professional's manifest awareness of the nonclient's reliance on the

---

[22] In any event, there is also no summary judgment evidence that Appellees had a meeting of the minds to commit one or more unlawful, overt fraudulent acts.  *See Massey*, 652 S.W.2d at 934.

misrepresentation and the professional's intention that the nonclient so rely. *Id*. Thus, the elements of a negligent misrepresentation claim are (1) the representation is made by a defendant in the course of his business or in a transaction in which he has a pecuniary interest, (2) the defendant supplies false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); *Grand Champion Film Prod., L.L.C. v. Cinemark USA, Inc.*, 257 S.W.3d 478, 485 (Tex. App.—Dallas 2008, no pet.). For a negligent misrepresentation, reliance must be justifiable. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

Appellants do not include a single record citation in their opening brief directing us to evidence that they claim raises a genuine issue of material fact to support their negligent misrepresentation claim. *See* Tex. R. App. P. 38.1(h) (requiring that briefs contain a clear and concise argument for the contentions made with appropriate citations to authorities and to the record). Nonetheless, considering all of the evidence submitted by Appellants in their response to Appellees' motion for summary judgment, including the evidence detailed in the bullet points immediately above, none of it raises a genuine issue of material

33

fact that Appellees supplied Appellants with false information that Appellants consequently justifiably relied on. *See Sloane*, 825 S.W.2d at 442. Appellants' claims are instead mostly based upon Appellees' alleged failures to disclose information related to matters associated with Appellees' rendering of services for Ver Vynck, Avery, AWP, or Infinity. Because Appellants failed to raise a genuine issue of material fact on one or more challenged negligent misrepresentation elements, we hold that the trial court did not err by granting summary judgment in favor of Appellees on Appellants' negligent misrepresentation claims. *See* Tex. R. Civ. P. 166a(i). We overrule the remainder of Appellants' fifth issue.

### E. Audio Cassette Tape Evidence

In their sixth issue, Appellants argue that the trial court erred and abused its discretion by overruling their objection to an audio cassette tape that Appellees included in their summary judgment evidence. The tape contains a recorded telephone conversation between Sankary and Ver Vynck. Appellants contend that Appellees failed to properly authenticate the tape and failed to show that the recording was accurate and that it had no changes, deletions, or additions. Because we affirm the trial court's grant of summary judgment in favor of Appellees on no-evidence grounds, we hold that error, if any, in the trial court's overruling of Appellants' objection to the tape was harmless. We

34

do not consider Appellees' summary judgment evidence submitted in support of their traditional motion for summary judgment to arrive at our holdings. *See* Tex. R. Civ. P. 166a(i); Tex. R. App. P. 44.1(a)(1). We overrule Appellants' sixth issue.

## IV.  MOTION FOR NEW TRIAL

In their seventh issue, Appellants argue that the trial court abused its discretion by denying their motion for new trial. They contend that they "filed their motion for new trial to bring the trial court's attention to the errors committed in granting the summary judgments." Because we affirm the trial court's grant of summary judgment in favor of Appellees on all of Appellants' claims, we hold that the trial court did not abuse its discretion by denying Appellants' motion for new trial. We overrule Appellants' seventh issue.

Because Appellants' third, fifth, sixth, and seventh issues are dispositive, we need not consider Appellants' first, second, and fourth issues. *See* Tex. R. App. P. 47.4.

## V.  PLEA TO THE JURISDICTION

In their sole cross-point, Appellees argue that the trial court should have sustained their plea to the jurisdiction. Because we affirm the trial court's grant of summary judgment in favor of Appellees on Appellants' claims, we need not consider Appellees' argument complaining of the trial court's failure to grant the

35

plea to the jurisdiction. *See id*. Accordingly, we overrule Appellees' cross-point.

## VI. CONCLUSION

Having overruled Appellants' third, fifth, sixth, and seventh issues, Appellants' dispositive issues, and having overruled Appellees' cross-issue, we affirm the trial court's order granting summary judgment in favor of Appellees on Appellants' claims.

PER CURIAM

PANEL: DIXON W. HOLMAN, J. (Senior Justice, Retired, Sitting by Assignment); LIVINGSTON and DAUPHINOT, JJ.

DELIVERED: February 5, 2009